**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 4 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

MICHAEL D. CAMFIELD,

    Plaintiff-Appellant,

       v.

CITY OF OKLAHOMA CITY, a
municipal corporation; BRITT HIGH,
SE KIM, BILL CITTY, GREGORY A.
TAYLOR, and MATT FRENCH,
individually and in their official
capacities as police officers for
defendant City of Oklahoma City;
ROBERT MACY, individually and in
his official capacity as District
Attorney for Oklahoma County,
Oklahoma, joined for purposes of
declaratory and injunctive relief; SAM
GONZALES; PATRICIA L. HIGH,
individually and in her official
capacity as Assistant District Attorney
for Oklahoma City, Oklahoma, joined
for purposes of declaratory and
injunctive relief and damages as
appropriate; M.T. BERRY, as Chief of
Police of the City of Oklahoma City in
his official capacity,

    Defendants-Appellees.

No. 00-6054

**Appeal from United States District Court
for the Western District of Oklahoma
(D.C. No. CIV-97-1097-T)**

Micheal C. Salem, Salem Law Offices, Norman, Oklahoma (Vincent J. Liesenfeld, Salem Law Offices, Norman Oklahoma; and Mark Henricksen, Henricksen & Henricksen, El Reno, Oklahoma, for the American Civil Liberties Union of Oklahoma, with him on the briefs), for the appellant.

Stacy Haws Felkner (Robert E. Manchester and Susan Ann Knight with her on the brief), Manchester & Pignato, P.C., Oklahoma City, Oklahoma, for the appellees Britt High, Se Kim, Matt French, and Gregory Taylor.

John M. Jacobsen, First Assistant District Attorney (Robert H. Macy, District Attorney, with him on the brief), Oklahoma City, Oklahoma, for the appellees Robert H. Macy and Patricia High.

Richard C. Smith, Litigation Division Head (William O. West, Municipal Counselor and Tina A. Hughes, Assistant Municipal Counselor, with him on the brief), Oklahoma City, Oklahoma, for the appellees City of Oklahoma City, Sam Gonzales, Bill Citty, and M.T. Berry.

Before **BRISCOE**, **MURPHY**, Circuit Judges, and **CROW**, District Judge.[*]

**BRISCOE**, Circuit Judge

This appeal arises from a well-publicized decision by the Oklahoma City Police Department (OCPD) to remove the Academy Award-winning film <u>The Tin Drum</u> from public access after a state judge opined in an ex parte hearing that the

---

[*] The Honorable Sam A. Crow, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

2

movie contained child pornography in violation of Oklahoma law. Michael Camfield, whose rented copy of the movie was obtained from him at his apartment by three OCPD officers, sued the City of Oklahoma City (City), several members of the OCPD and two state prosecutors under 42 U.S.C. § 1983, alleging violations of his First, Fourth and Fourteenth Amendment rights. He also sought declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and civil damages under the Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710.

At the conclusion of the litigation, which included a jury trial, Camfield obtained partial declaratory relief and statutory damages on his VPPA claim, but was unsuccessful on his section 1983 claims and his attempt to have Oklahoma's child pornography statute, Okla. Stat. tit. 21, § 1021.2, struck down as unconstitutional. He appeals the district court's summary judgment order, various evidentiary rulings and jury instructions, and the denial of his motion to alter or amend the judgment. We have jurisdiction under 28 U.S.C. § 1291 and affirm in part and dismiss in part.

I.

The Tin Drum, a German language film with English subtitles, received the 1979 Academy Award for best foreign language film and shared the Palme D'Or Award at the Cannes International Film Festival that same year. Based on the 1959 novel of the same name by Günter Grass, the film has been described as a

complex allegorical fantasy intended to symbolize the rise of Nazism and the corresponding decline of morality in Nazi Germany. The movie opens in Danzig in the 1930s when the main character, Oskar Matzerath, decides to stop growing at the age of three in order to "protest against the absurdities and obscenities of the adult world" during the rise of Nazism. App. Vol. 17 at 5544. Throughout the approximately eighteen years depicted in the film, Oskar remains diminutive in size and appears to be a very young boy, while those around him continue to age normally. Not until the end of the film and near the end of World War II, when Oskar is twenty-one years old, does he express a desire to resume growing again. The movie, which has been in public circulation around the world for over twenty years, has received critical acclaim and been discussed in several academic articles and books related to film studies.

In June 1997, a citizen complained to OCPD Maj. William Citty that The Tin Drum contains child pornography. Maj. Citty contacted vice division Lt. Gregory Taylor, advised him of the complaint and asked him to obtain a copy of the movie. Lt. Taylor did so and assigned the case to Sgt. Se Kim. Sgt. Kim watched the movie, observed certain scenes he believed contained child pornography and, in accordance with a common vice division practice, took the movie to the county courthouse to request judicial confirmation of his opinion. A state judge agreed to watch the movie and give his own opinion.

On the morning of June 24, 1997, Sgt. Kim and Sgt. Britt High met with the judge, who advised the officers he believed The Tin Drum contained child pornography in violation of Okla. Stat. tit. 21, § 1021.2. The judge communicated his decision orally and did not issue a written ruling or specify which scenes violated the law. However, the judge later explained that he based his opinion on three scenes in the movie, which have been referred to in this litigation as (1) the bathhouse scene, (2) the bedroom scene, and (3) the sitting room scene. All three scenes portray Oskar and a female character named Maria Matzerath as being sixteen years old, although at the time of filming the actor playing Oskar was eleven years old and the actress playing Maria was twenty-four. According to the judge, the bathhouse scene shows Oskar "engaged in or portrayed, depicted or represented to be engaging in an act of cunnilingus with" Maria. App. Vol. 9 at 2704. In the bedroom scene, Oskar "begins to engage in or is portrayed, depicted, or represented as engaging in an act of sexual intercourse with" Maria. Id. Finally, in the sitting room scene, Oskar observes Maria and an adult male "engaged in or portrayed, depicted, or represented as engaging in sexual intercourse" on a couch. Id. at 2705.

Later that day, Lt. Taylor notified Maj. Citty of the judge's ruling. Maj. Citty then contacted OCPD Police Chief Sam Gonzales, told him about the judge's decision, and said he was going to have his officers confer with the

5

district attorney's office to decide what to do next.

The next day, on June 25, 1997, Sgt. High proposed a plan in which the officers would go to video stores in Oklahoma City that rented The Tin Drum and ask the employees to voluntarily relinquish their store's copies of the movie; if any copies were checked out, the officers would ask the employees to provide each renter's name and address. Sgt. High had already mentioned this voluntary surrender plan to his wife, Assistant District Attorney Patricia High, who handled obscenity and child pornography cases for the Oklahoma County District Attorney's Office, and she voiced no objections. After being told of the plan, Maj. Citty told Lt. Taylor to arrange a meeting with ADA High to discuss the matter further. ADA High could not meet with the officers due to her trial schedule, but she told Lt. Taylor over the telephone that the plan was fine with her and that warrants were unnecessary as long as the officers sought voluntary surrender of the videotapes. At Lt. Taylor's request, she also called Maj. Citty and reconfirmed her approval of the plan. At the end of the conversation, Maj. Citty asked ADA High to speak directly with District Attorney Robert Macy about the plan. ADA High told DA Macy that the OCPD was planning to obtain the videos through voluntary consent, unless the movies had already been rented, in which case the officers would ask the persons renting the movie to voluntarily surrender their copies. When asked if he had any problems with the plan, DA

6

Macy said "no, probably not." App. Vol. 12 at 3655. Later that afternoon, Maj. Citty also spoke to DA Macy and asked if the OCPD should remove the film from public access. DA Macy responded "something like that." App. Vol. 8 at 2302. Maj. Citty then called Lt. Taylor and directed him to implement the plan for voluntary relinquishment of The Tin Drum. Maj. Citty reiterated that the videotapes must be obtained totally voluntarily and that if cooperation was not forthcoming, the officers should leave and take steps to obtain a warrant.

That evening, Sgt. High, Sgt. Kim, and a third officer, Sgt. Matt French, went to several video stores in Oklahoma City and obtained all available copies of The Tin Drum. They also asked for and received the names and addresses of several customers who were renting the movie. One of those customers was Michael Camfield, and the officers went to his apartment to ask for his copy of the movie. Camfield is the Development Director of the American Civil Liberties Union of Oklahoma. He had recently learned of the controversy surrounding The Tin Drum and was watching the film to formulate rebuttals and policy responses on behalf of the ACLU when the officers knocked on his door. Sgt. High told Camfield that the film contained child pornography under Oklahoma law; Camfield responded that he disagreed with the judge's determination. A "great debate" concerning the artistic merits of the movie ensued, App. Vol. 21 at 6724, but Camfield eventually turned over his copy of the videotape to the officers. As

7

a result of the voluntary surrender plan, the OCPD removed a total of nine copies of the movie from public circulation. No warrants were issued for any of the videotapes. Although Camfield and other parties later revoked their consent and demanded the return of their videotapes, the OCPD refused.

Camfield subsequently sued the City, DA Macy, Sgt. High and Sgt. Kim in federal court. He alleged that the defendants violated the VPPA, 18 U.S.C. § 2710, and infringed his rights under the First, Fourth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983. He also sought a declaratory judgment that the OCPD's voluntary surrender plan constituted an unconstitutional prior restraint; that The Tin Drum does not contain child pornography; and that Oklahoma's child pornography laws are overly broad in violation of the First Amendment. Camfield later amended his complaint to add Chief Gonzalez, Interim Chief Richard DeLaughter, ADA High, Maj. Citty, Lt. Taylor and Sgt. French as defendants. With the exception of Chief Gonzales, who was sued only in his individual capacity, and Interim Chief DeLaughter, who was sued only in his official capacity, each of the individual defendants was sued in his or her individual and official capacity.[1]

Ruling on the parties' cross-motions for summary judgment, the district

---

[1] Because Interim Chief DeLaughter was sued only in his official capacity, Chief M.T. Berry was substituted as a defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure when he replaced DeLaughter.

8

court resolved a majority of Camfield's claims. Adopting and incorporating its ruling from a related declaratory judgment action, Oklahoma ex rel. Macy v. Blockbuster Videos, Inc., No. 97-1281-T, 1998 WL 1108158 (W.D. Okla. Oct. 20, 1998), the district court first held that Camfield was entitled to a declaratory judgment that The Tin Drum is not subject to criminal prosecution under Okla. Stat. tit. 21, § 1021.2. Based on this ruling, however, the district court concluded there was no need to address Camfield's facial challenge to section 1021.2.

Turning to Camfield's section 1983 claims, the district court held that the individual defendants enjoyed Eleventh Amendment immunity to the extent they were being sued for money damages in their official capacities. As for the individual capacity claims, the district court adopted and incorporated its order from a related temporary injunction proceeding, Video Software Dealers Assoc., Inc. v. City of Oklahoma City, 6 F. Supp.2d 1292 (W.D. Okla. 1997), and held that the OCPD's complete removal and retention of the movie from public access without a prior adversarial hearing violated the First and Fourteenth Amendments. However, the district court granted summary judgment to each individual defendant on this claim based on qualified immunity and/or lack of personal participation. The district court next determined that, in the absence of voluntary consent, the warrantless removal of Camfield's rented copy of The Tin Drum from him at his apartment would constitute an unlawful seizure in violation of the

9

Fourth Amendment. Once again, however, the district court granted summary judgment based on qualified immunity and/or lack of personal participation to most of the individual defendants. The only exceptions were Sgts. High, Kim and French, because there was a factual dispute as to whether Camfield voluntarily gave them his copy of The Tin Drum. Finally, finding no basis for municipal liability, the district court granted summary judgment to the City as to each of Camfield's section 1983 claims.

With regard to Camfield's claim under the VPPA, the district court held that Sgts. High, Kim and French violated the Act as a matter of law when they obtained Camfield's name and address from the video store without a warrant or court order. The district court subsequently held that the City was liable for any damages that Camfield incurred as a result of this violation because the officers were acting within the scope of their employment. However, because the actual amount of Camfield's damages involved questions of fact, the district court left that issue for the jury.

The case proceeded to trial on the issues of (1) whether Sgts. High, Kim and French violated Camfield's Fourth Amendment rights by taking his copy of The Tin Drum without his voluntary consent; (2) the amount of damages if there was a Fourth Amendment violation; and (3) the proper amount of damages for the officers' violation of the VPPA. Although Camfield also sought to pursue a claim

that the officers were liable under the Fourth Amendment regardless of whether he gave voluntary consent because they "constructively seized" his copy of The Tin Drum, the district court held that the Fourth Amendment issue at trial would be limited to whether Camfield voluntarily relinquished the videotape. After a three-day trial, the jury found in favor of Sgts. High, Kim and French on Camfield's Fourth Amendment claims and awarded Camfield the statutory minimum of $2500 in liquidated damages on his VPPA claim.

The district court subsequently denied Camfield's motion to alter or amend the judgment, which sought, among other things, an injunction directing an accounting of OCPD's records and the expunction of any information that linked him with a child pornography investigation.

## II.

Camfield raises six issues on appeal. Specifically, he contends that the district court erred by (1) refusing to address the constitutionality of Oklahoma's child pornography statute; (2) granting partial summary judgment on his section 1983 claims; (3) rejecting his "constructive seizure" claim; (4) excluding certain evidence from trial; (5) giving improper instructions to the jury; and (6) refusing to order the expunction of his name from OCPD's records.

### Constitutionality of Okla. Stat. tit. 21, § 1021.2

Camfield contends that the district court erred in declining to consider the

constitutionality of Oklahoma's child pornography statute, Okla. Stat. tit. 21, § 1021.2. We review a constitutional challenge to a state statute de novo. Am. Target Adver., Inc. v. Giani, 199 F.3d 1241, 1247 (10th Cir.), cert. denied, 121 S. Ct. 34 (2000). Where the activity in question is arguably protected by the First Amendment, "'an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.'" Lytle v. City of Haysville, 138 F.3d 857, 862 (10th Cir. 1998) (quoting Rankin v. McPherson, 483 U.S. 378, 386 n.9 (1987)).

At the time the OCPD instituted its plan to obtain voluntary relinquishment of The Tin Drum, section 1021.2 provided in relevant part:

> Any person who shall procure or cause the participation of any minor under the age of eighteen (18) years in any film, motion picture, videotape . . . or any type of obscene material wherein the minor is engaged in or portrayed, depicted, or represented as engaging in any act of sexual intercourse, in any act of fellatio or cunnilingus, . . . or who knowingly possesses, procures, or manufactures, or causes to be sold or distributed any obscene material involving the participation of any minor under the age of eighteen (18) shall be guilty, upon conviction, of a felony.

Okla. Stat. Ann. tit. 21, § 1021.2 (Supp. 1997) (emphasis added).

As the district court explained in the related declaratory judgment action, Oklahoma ex rel. Macy, 1998 WL 1108158, it is undisputed that the eleven-year-old actor playing Oskar Matzerath and the twenty-four-year-old actress playing

12

Maria Matzerath were not actually "engaged in" sexual conduct during the three scenes at issue in The Tin Drum. However, the court also observed that the absence of actual sexual activity did not automatically render section 1021.2 inapplicable because the statute also prohibits material in which a minor is "portrayed, depicted, or represented as engaging in" sexual conduct. The district court concluded that the bathhouse scene, the bedroom scene and the sitting room scene were each covered by the express language of section 1021.2 because those scenes portrayed Oskar and Maria as sixteen-year-old minors engaged in sexual conduct.

Notwithstanding its conclusion that The Tin Drum contained certain scenes prohibited by section 1021.2, the district court determined that the movie was not subject to criminal penalties because it qualified for a statutory exception applicable to bona fide works of art that do not appeal to prurient interests:

> This act shall not apply to persons who may possess or distribute obscene matter or participate in conduct otherwise prescribed by this act, when such possession, distribution, or conduct occurs in the course of law enforcement activities, or in the course of bona fide scientific education or comprehensive research or study, or bona fide objects of art or artistic pursuits, or like circumstances or justification, where the possession, distribution or conduct is not related to the subject matter's appeal to prurient interests.

Okla. Stat. Ann. tit. 21, § 1021.1 (1983). Adopting and incorporating that ruling into its order in this case resolving the parties' cross-motions for summary judgment, the district court concluded that because the artistic exception of

13

section 1021.1 saves the movie from criminal prosecution under section 1021.2, there was no need to decide whether section 1021.2 was overly broad in contravention of the First Amendment.

On appeal, Camfield does not challenge the district court's holding that the three scenes at issue in The Tin Drum fall within the "portrayed, depicted, or represented as engaging in any [sexual] act" language of section 1021.2. Nor does he argue that the district court erred in holding that the artistic exception of section 1021.1 applies to the child pornography prohibitions of section 1021.2. Rather, Camfield contends that the district court should have addressed the constitutionality of section 1021.2 and struck down its "simulated sex" language as overbroad. Such a declaration is important, Camfield argues, because in his view the district court's reliance on the artistic exception of section 1021.2 – rather than on the constitutional protections of the First Amendment itself – failed to "free The Tin Drum from government imputations of child pornography." Appellant's Opening Br. at 35.

Several defendants counter that Camfield's constitutional challenge was mooted by the Oklahoma Legislature's significant revision of its child pornography and obscenity laws during the pendency of this appeal. See H.B. 2104, 47th Leg., 2d Sess. (Okla. 2000). Of particular relevance to this case, the Legislature narrowed the definition of "child pornography" prohibited by section

14

1021.2 to include only material in which a minor is actually "engaged in" or "observes" any of several statutorily-defined sexual acts. See Okla. Stat. Ann. tit. 21, § 1024.1(A) (Supp. 2001). As a result, section 1021.2 no longer criminalizes material wherein a minor is merely "portrayed, depicted, or represented as engaging in" sexual acts.

We agree that this amendment moots Camfield's constitutional challenge to section 1021.2. "'A case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" Citizens for Responsible Gov't State Political Action Comm. v. Davidson, 236 F.3d 1174, 1182 (10th Cir. 2000) (quoting City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000)); see also Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.") (internal quotation marks omitted). Because "parties have no legally cognizable interest in the constitutional validity of an obsolete statute," Davidson, 236 F.3d at 1182, a statutory amendment moots a case "to the extent that it removes challenged features of the prior law," Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1310 (11th Cir. 2000). Here, the Legislature deleted the "simulated sex" language from section 1021.2 that Camfield argues is overbroad. Any decision on our part as to the

constitutional validity of that prior version of the statute would constitute a "textbook example of advising what the law would be upon a hypothetical state of facts" rather than upon an actual case or controversy as required by Article III of the Constitution. Nat'l Adver. Co. v. City & County of Denver, 912 F.2d 405, 412 (10th Cir. 1990) (internal quotation marks omitted).

Relying on City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283 (1982), Camfield argues that his constitutional challenge remains "live" because the Oklahoma Legislature is free to reenact the prior version of section 1021.2 at any point in the future. In Aladdin's Castle, the Supreme Court held that the repeal of an ordinance that the district court had struck down as unconstitutional did not moot the appeal because the City could reenact "precisely the same provision if the District Court's judgment were vacated." Id. at 289. Although we have previously quoted Aladdin's Castle for the "well settled" proposition that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," Longstreth v. Maynard, 961 F.2d 895, 901 (10th Cir. 1992), this court has not applied Aladdin's Castle in the context of a state legislature's repeal or revision of a challenged statute. Moreover, other circuits which have addressed this particular issue have observed that a critical factor in the Aladdin's Castle decision was the City's openly-announced intention to reenact the unconstitutional ordinance if the case

16

was dismissed as moot.  See Valero Terrestrial Corp. v. Paige, 211 F.3d 112, 116 (4th Cir. 2000) (citing Aladdin's Castle, 455 U.S. at 289 & n.11); Kentucky Right to Life, Inc. v. Terry, 108 F.3d 637, 645 (6th Cir. 1997) (same); Barilla v. Ervin, 886 F.2d 1514, 1521 (9th Cir. 1989) (same; also citing Aladdin's Castle, 455 U.S. at 296 n.1 (White, J., concurring in part and dissenting in part)).  These circuits have therefore interpreted Aladdin's Castle as precluding a mootness determination in cases challenging a prior version of a state statute only when the legislature has openly expressed its intent to reenact the challenged law.  See Valero Terrestrial Corp., 211 F.3d at 116; Kentucky Right to Life, 108 F.3d at 645; Barilla, 886 F.2d at 1521.  We join these circuits and hold that Aladdin's Castle is inapposite in cases such as this where there is no evidence in the record to indicate that the legislature intends to reenact the prior version of the disputed statute.

Finally, Camfield argues that a live case or controversy exists because the recent legislative amendments explicitly require law enforcement officers to seize an evidentiary copy of suspected child pornography or all copies of "explicit" child pornography found in the possession of any person arrested for violating Oklahoma's child pornography laws.  See Okla. Stat. Ann. tit. 21, §§ 1022, 1024.3 (Supp. 2001).  Although Camfield apparently believes these statutes run afoul of the First Amendment because they do not require an adversarial hearing

17

prior to seizure, that issue is irrelevant to the question of whether the simulated sex language of the prior version of section 1021.2 is unconstitutionally overbroad.[2] We conclude that this portion of Camfield's appeal is moot and is thereby subject to dismissal.

## Summary Judgment

Camfield next contends that the district court erred in granting summary judgment to several defendants on his section 1983 claims. We review a district court order granting summary judgment de novo. Cooperman v. David, 214 F.3d 1162, 1164 (10th Cir. 2000). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Cooperman, 214 F.3d at 1164.

---

[2] In its answer brief, the City chastises Camfield for challenging the newly-enacted statutes on this basis, asking rhetorically: "Does Camfield now admit that despite all his testimony to the contrary, that he wants to possess/distribute materials which record the sexual abuse of children?" City's Answer Br. at 38. Though wholly inappropriate and completely unfounded, the City's answer brief is laced with this and other *ad hominem* attacks against Camfield and his counsel. We are disappointed that the City's counsel has chosen to abandon the decorum and respect for opposing parties and counsel that we expect from members of our bar.

In its summary judgment order, the district court determined that Camfield properly alleged the deprivation of two constitutional rights. First, the district court concluded that the OCPD's complete removal of The Tin Drum from public access without a prior adversarial hearing constituted a prior restraint on speech in violation of the First and Fourteenth Amendments. Second, the district court held that the OCPD's warrantless removal of the videotape from Camfield at his apartment would constitute an unlawful seizure in violation of the Fourth Amendment absent his voluntary consent.[3] Nevertheless, the district court held that a majority of the defendants were entitled to summary judgment on both claims. Camfield challenges several of those rulings on appeal.

*Individual defendants*

The district court granted summary judgment based on qualified immunity to every individually-named defendant on the prior restraint claim and to every individually-named defendant except Sgts. High, Kim and French on the unlawful

_____

[3] Based on these rulings, we reject Camfield's assertion that the district court failed to address the issue of whether he properly alleged the violation of a constitutional right before it determined that the individual defendants enjoyed qualified immunity. See Conn v. Gabbert, 526 U.S. 286, 290 (1999) (when evaluating qualified immunity defense, courts "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation").

seizure claim. "The qualified immunity doctrine shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." Greene v. Barrett, 174 F.3d 1136, 1142 (10th Cir. 1999). On appeal, Camfield does not seem to challenge the district court's grant of qualified immunity with respect to his unlawful seizure claim, but he does argue the district court erred in granting qualified immunity to each of the individually-named defendants with respect to his prior restraint claim.

Although the district court apparently assumed that the OCPD's complete removal of The Tin Drum from public access without a prior adversarial hearing violated a clearly established constitutional prohibition against prior restraint, it granted qualified immunity on Camfield's prior restraint claim for three different reasons. First, it held that Maj. Citty, Lt. Taylor, Sgt. High, Sgt. Kim and Sgt. French enjoyed qualified immunity under the "extraordinary circumstances" doctrine because they all relied on ADA High's legal advice in implementing the voluntary surrender plan. See Hollingsworth v. Hill, 110 F.3d 733, 740 (10th Cir. 1997) (recognizing that a defendant may be entitled to immunity from suit if he can show that extraordinary circumstances prevented him from knowing his actions were unconstitutional and thus "should not be imputed with knowledge of

20

an admittedly clearly established right"). Second, the district court held that ADA High was entitled to qualified immunity because a reasonable person in her position could have concluded, in light of the state judge's ruling concerning The Tin Drum and the lack of any prior case law applying the artistic exception of section 1021.1 to the child pornography prohibitions of section 1021.2, that the movie did not enjoy any First Amendment protection and that its total removal from public access would therefore be constitutional. See New York v. Ferber, 458 U.S. 747 (1982) (holding that child pornography is not protected by the First Amendment). Finally, the district court held that Chief Gonzales and DA Macy both enjoyed qualified immunity because they were not personally responsible for the implementation of the voluntary surrender plan. See Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996) (personal participation is an essential element of a § 1983 claim).

According to Camfield, none of these reasons provide a proper basis for granting qualified immunity. Specifically, he asserts that the district court (1) misapplied the extraordinary circumstances doctrine in granting Maj. Citty, Lt. Taylor, Sgt. High, Sgt. Kim and Sgt. French qualified immunity; (2) improperly focused on ADA High's erroneous interpretation of Oklahoma law in awarding her qualified immunity; and (3) ignored factual disputes regarding the personal involvement of Chief Gonzales and DA Macy in the implementation of the

voluntary surrender plan in granting them qualified immunity.

Given the district court's analysis, Camfield's focus on these issues is not unreasonable, but his arguments are necessarily preempted by our conclusion that the district court did not conduct a proper qualified immunity inquiry. As we recently reiterated in Nelson v. McMullen, 207 F.3d 1202, 1205 (10th Cir. 2000), the plaintiff bears the burden of satisfying a strict two-part test once a defendant invokes a qualified immunity defense. "'First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right. Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue.'" Id. at 1206 (quoting Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995)). Only if the plaintiff meets this two-part test do we decide whether the defendant has met the traditional burdens of showing "'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" Id. (quoting Albright, 51 F.3d at 1535).

In its summary judgment order in this case, the district court acknowledged this two-part test but did not thoroughly analyze the second step with regard to the prior restraint claim. Indeed, after concluding that the OCPD's complete removal of The Tin Drum from public access without a prior adversarial hearing violated the First and Fourteenth Amendments, the district court apparently

22

presumed the law on this issue was clearly established and then went on to hold, for the reasons stated above, that the individually-named defendants were nonetheless entitled to qualified immunity on this claim.

Consequently, before we may determine whether the district court properly granted qualified immunity in the face of what it assumed was clearly-established law on prior restraint, we must first decide whether Camfield has shown that the voluntary surrender plan constituted an unconstitutional prior restraint on speech and, if so, whether the law was clearly established when the OCPD implemented the plan in June 1997.

The district court, relying primarily on Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46 (1989), agreed with Camfield that the voluntary surrender plan was unconstitutional. In Fort Wayne Books, an obscenity case, the Supreme Court acknowledged that obscene speech is unprotected by the First Amendment, but it recognized that, to avoid the risk of prior restraint on speech, the government must use "rigorous procedural safeguards" before it may remove from public circulation expressive materials, including movies, which it considers obscene. Id. at 62. Specifically, the Court held that "[w]hile a single copy of a book or film may be seized and retained for evidentiary purposes based on a finding of probable cause, the publication may not be taken out of circulation completely until there has been a determination of obscenity after an adversary hearing." Id.

23

at 63. This is because the legal determination of obscenity, which requires an evaluation of the presumptively protected material under the three-part test set forth in Miller v. California, 413 U.S. 15, 24 (1973), is properly left to a court for resolution through an adversarial hearing where both sides may be heard rather than to a police officer acting individually or, for that matter, a judge acting ex parte. Adopting this rationale here, the district court held that the OCPD's complete removal of The Tin Drum from public access without a prior judicial adversarial hearing as to whether the movie contains child pornography ran afoul of the First and Fourteenth Amendments.[4]

As an initial matter, we do not necessarily agree with the implication that compliance with Fort Wayne Books is always required whenever the government seeks to remove suspected child pornography from public access. Like obscenity, child pornography is "a category of material outside the protection of the First

---

[4] Although the defendants had argued that a constitutional violation could not have occurred because the plan was premised on "voluntary" relinquishment of The Tin Drum, see Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 71-72 (1963) ("we do not mean to suggest that private consultation between law enforcement officers and distributors prior to the institution of a judicial proceeding can never be constitutionally permissible. We do not hold that law enforcement officers must renounce all informal contacts with persons suspected of violating valid laws prohibiting obscenity."), the district court observed in an earlier ruling that an unconstitutional prior restraint may take a "variety of forms," Video Software Dealers, 6 F. Supp.2d at 1296 n.4 (quoting Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 552-53 (1975)), and that the OCPD admitted it intended to remove all public copies of the movie and then refused to return any copies even after the parties from whom they were obtained revoked their voluntary consent.

Amendment." Ferber, 458 U.S. at 763. However, child pornography differs from obscenity in two important respects. First, child pornography is afforded even less constitutional protection than obscenity. See Osborne v. Ohio, 495 U.S. 103 (1990) (states may outlaw private possession of child pornography even though Stanley v. Georgia, 394 U.S. 557 (1969), held that states may not constitutionally prohibit private possession of obscene material); Ferber, 458 U.S. at 764-65 (states may regulate child pornography even if material is not obscene under three-part Miller test). Second, as courts have noted in the context of probable cause determinations, the difficulty encountered in determining whether material is obscene often is absent when determining whether material contains child pornography. See United States v. Kimbrough, 69 F.3d 723, 727-28 (5th Cir. 1995) ("Identification of visual depictions of minors engaging in sexually explicit conduct, in comparison [to the legal determination of whether expressive material is obscene], is a factual determination that leaves little latitude to the officers."). See also United States v. Simpson, 152 F.3d 1241, 1247 (10th Cir. 1998) ("the words 'child pornography' 'need no expert training or experience to clarify their meaning'") (quoting United States v. Layne, 43 F.3d 127, 132-33 (5th Cir. 1995)); United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993) ("Most minors look like minors and most adults look like adults, and most of the time most law enforcement officers can tell the difference."); American Library Ass'n v. Barr,

25

956 F.2d 1178, 1192 (D.C. Cir. 1992) ("However hazy the line between obscenity and protected speech, the line between eighteen years old and under is not 'dim and uncertain.'"); United States v. Hurt, 808 F.2d 707, 708 (9th Cir. 1987) ("Any rational adult person can recognize sexually explicit conduct engaged in by children under the age of 16 when he sees it."). These "child pornography holdings demonstrate that [unlike cases involving obscenity,] courts do not require more rigorous procedural safeguards or an adversarial hearing prior to seizure when law enforcement officers have objective and non-evaluative criteria by which to make their determinations." Boggs v. Merletti, 987 F. Supp. 1, 8 (D.D.C. 1997), aff'd on other grounds sub nom., Boggs v. Rubin, 161 F.3d 37 (D.C. Cir. 1998). Therefore, while we do not decide the issue here, we note that the question of whether a prior adversarial hearing is required before the government may seize all copies of suspected child pornography is far different and significantly more difficult than the question of whether a prior adversarial hearing is required before the government may seize all copies of suspected obscenity.

Nevertheless, under the particular facts of this case, we agree with the district court that the voluntary surrender plan imposed an unconstitutional prior restraint on speech. Our holding is based on the fact that at the time the OCPD implemented the voluntary surrender plan, Oklahoma's child pornography laws

26

included the statutory exception for bona fide works of art that do not appeal to prurient interests, see Okla. Stat. Ann. tit. 21, § 1021.1 (1983), an exception which essentially inserted parts of the Miller test into the definition of child pornography under section 1021.2, see Miller, 413 U.S. at 24 (requiring evaluation of whether suspected obscene material appeals to the prurient interest, portrays sexual conduct in a patently offensive way, and taken as a whole, lacks any serious literary, artistic, political, or scientific value). Thus, while an OCPD officer could reasonably have made the factual determination of whether certain scenes in The Tin Drum satisfied the definition of child pornography in section 1021.2 before implementing the voluntary surrender plan, the determination of whether the movie fell within the artistic exception of section 1021.1 was necessarily a legal one that required a judicial adversarial hearing as set forth in Fort Wayne Books. Because the OCPD did not timely seek such a hearing, its complete removal of The Tin Drum from public access was unconstitutional.

We must next determine whether this law was clearly established when the officers implemented the voluntary surrender plan in June 1997. A constitutional right is clearly established when there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992)).

27

Camfield has failed to meet his burden in this regard. Although the law was clearly established in June 1997 that the government could not completely remove suspected obscenity from public access without a judicial determination of obscenity following an adversarial hearing, Fort Wayne Books, 489 U.S. at 63; In re Search of Kitty's East, 905 F.2d 1367, 1371 n.3 (10th Cir. 1990), Camfield does not cite, nor have we found, any cases which have held that the complete removal of suspected child pornography from public circulation without a prior adversarial hearing constitutes a prior restraint. This absence of related cases is significant in light of the aforementioned differences between obscenity and child pornography and is fatal to Camfield's attempt to obtain a reversal of the district court's grant of qualified immunity on his prior restraint claim. See Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 530 (10th Cir. 1998) (qualified immunity is proper when plaintiff fails to cite any case law which demonstrates the violation of a clearly established constitutional right).

Accordingly, because Camfield has not met his threshold burden of demonstrating that the voluntary surrender plan violated a clearly established constitutional right, we find it unnecessary to address his specific factual and legal arguments as to why the district court erred in granting qualified immunity to each of the individually-named defendants. See Albright, 51 F.3d at 1535 ("a defendant is entitled to qualified immunity if the plaintiff fails to show that the

law was clearly established").

*City of Oklahoma City*

The district court also granted summary judgment to the City on both the prior restraint and unlawful seizure claims. "Qualified immunity is not available as a defense to municipal liability." Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2000) (citing Owen v. City of Independence, 445 U.S. 622, 638 (1980)). "A municipality cannot, however, be held liable for the actions of its employees under the theory of respondeat superior." Id. (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978)). Instead, the plaintiff must show "that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action." Id. (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 480-83 (1986) (plurality opinion); Murrel v. Sch. Dist. No. 1, 186 F.3d 1238, 1248-49 (10th Cir. 1999)).

Camfield argued in district court that the City is liable under section 1983 because the OCPD officers who implemented the voluntary surrender plan did so pursuant to a municipal policy of seeking ex parte judicial review of expressive material and then completely removing that material from public circulation whenever a state judge determines the material contains obscenity or child

29

pornography. The district court disagreed, and it granted summary judgment to the City on the basis that the evidence did not support a finding that the officers acted pursuant "to an established policy approved by the city." App. Vol. 17 at 5463.

On appeal, Camfield implies that the district court erroneously focused on whether the OCPD officers followed an "approved" municipal policy. He also argues there is evidence that the officers followed an informal City policy of completely removing expressive material from public circulation after an ex parte judicial determination that the material contains either child pornography or obscenity.

We agree that the district court may have applied the wrong legal standard in basing its decision on the existence of a formally "approved" municipal policy. As we explained in Watson v. City of Kansas City, 857 F.2d 690, 695 (10th Cir. 1988), an unconstitutional policy or custom need not be formal or written to create municipal liability. Rather, a municipality may be held liable when the illegal practice is "'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" Cannon v. City & County of Denver, 998 F.2d 867, 877 (10th Cir. 1993) (quoting Monell, 436 U.S. at 691).

Nonetheless, we conclude that the district court properly granted summary judgment to the City because there is no evidence that the OCPD implemented the

30

voluntary surrender plan pursuant to a "permanent and well settled" policy of completely removing expressive material from public access. Although Taylor's deposition testimony tends to show that the OCPD sought ex parte determinations of obscenity or child pornography from state judges on numerous occasions prior to implementation of the voluntary surrender plan at issue here, Camfield does not present, nor have we found, any evidence which indicates that once such a determination was made, the OCPD enacted a plan to seek voluntary surrender of those materials.[5] This lack of evidence is important because, despite Camfield's apparent belief to the contrary, the district court did not hold that the First and Fourteenth Amendments were violated simply because the OCPD sought ex parte review of The Tin Drum. Rather, the district court held that it was the complete

---

[5] Camfield places heavy reliance on a stipulation by the City and a training outline written by Sgt. High as evidence of a City policy of completely removing expressive material from public circulation. The stipulation states that the OCPD "attempted to remove from public access all copies of the motion picture The Tin Drum . . . available for public distribution in Oklahoma City." App. Vol. 13 at 3918. The training outline states in relevant part that "NO RULING IS NEEDED FOR CHILD PORNOGRAPHY AND AN IMMEDIATE ARREST SHOULD BE MADE OF ANYONE POSSESSING SUCH MATERIAL AND THE MATERIAL SHOULD BE SEIZED." Id. at 3887 (emphasis in original). Neither document assists Camfield. First, simply because the City admitted that the OCPD sought to completely remove a movie from public circulation in one particular instance does not mean that it has done so in the past. Second, a training outline which authorizes criminal arrest and seizure of child pornography simply has no bearing on the question of whether the City has a policy of civil enforcement of Oklahoma's child pornography laws by seeking, without arrest or prosecution, the voluntary surrender of material suspected to contain child pornography.

31

removal of the film from public access without a prior adversarial hearing which constituted a prior restraint on speech.

Camfield's effort to fit the facts of this case under the rubric of Ross v. Neff, 905 F.2d 1349 (10th Cir. 1990), is unsuccessful. In Ross, another section 1983 case, we reversed a directed verdict in favor of a county in Oklahoma based on the sheriff's testimony concerning his belief as to the legality of his deputy's unlawful arrest. As we explained, this testimony was sufficient to "permit the jury to find a custom or policy to allow county officers to make [similar unlawful] arrests." Id. at 1355. Camfield argues that a triable issue of fact was likewise created in this case by a press release from Chief Gonzales which, according to Camfield, defended the legality of the voluntary surrender plan. To the contrary, the press release did not state that the OCPD officers acted legally. Instead, it merely described the actions the officers took in obtaining copies of The Tin Drum, and it expressed Chief Gonzales' disagreement with recent allegations in the media that the OCPD "seized" copies of the film from the public.

As a final basis for municipal liability, Camfield argues that the City may be held liable simply because it provided counsel to defend its officers in this litigation. Camfield does not cite any authority in his opening brief for this proposition, and we reject it as frivolous. The district court properly entered summary judgment in favor of the City.

32

<u>"Constructive Seizure" Claim</u>

Camfield contends that the district court erred in holding he could not pursue a "constructive seizure" claim under the Fourth Amendment against Sgts. High, Kim and French at trial. We review the district court's decisions on questions of law de novo. <u>Dang v. UNUM Life Ins. Co.</u>, 175 F.3d 1186, 1189 (10th Cir. 1999).

Under Camfield's constructive seizure theory, because <u>The Tin Drum</u> is presumptively protected by the First Amendment, <u>see</u> <u>Lo-Ji Sales, Inc. v. New York</u>, 442 U.S. 319, 326 n.5 (1979), Sgts. High, Kim and French violated the Fourth Amendment as a matter of law when they came to his door, announced that the movie contained child pornography, and allegedly used threats of arrest or prosecution to obtain his copy of the movie. In Camfield's view, because such conduct constitutes a per se violation of the Fourth Amendment, it is irrelevant that the jury found he voluntarily surrendered his copy of <u>The Tin Drum</u> to the officers.

Camfield's arguments demonstrate a fundamental misunderstanding of the interplay between the First and Fourth Amendments as they relate to government conduct involving expressive materials. "The First Amendment imposes special constraints on searches for and seizures of presumptively protected material, . . . and requires that the Fourth Amendment be applied with 'scrupulous

33

exactitude' in such circumstances." Maryland v. Macon, 472 U.S. 463, 468 (1985). "Thus, while the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause (and even without a warrant in various circumstances), it is otherwise when materials presumptively protected by the First Amendment are involved." Fort Wayne Books, 489 U.S. at 63 (citing Lo-Ji Sales, 442 U.S. at 326 n.5). "It is '[t]he risk of prior restraint, which is the underlying basis for the special Fourth Amendment protections accorded searches for and seizures of First Amendment materials' that motivates this rule." Id. at 63-64 (quoting Macon, 472 U.S. at 470). However, the mere fact that an encounter between the police and a member of the public involves materials that are presumptively protected by the First Amendment does not expand the scope of the Fourth Amendment to regulate government conduct that would not constitute a search or seizure in other contexts. As the Supreme Court has made clear, in order to trigger the special Fourth Amendment protections that First Amendment materials enjoy, the government must actually conduct a "search" or "seizure." Macon, 472 U.S. at 468-69 ("Absent some action taken by government agents that can properly be classified as a 'search' or a 'seizure,' the Fourth Amendment rules designed to safeguard First Amendment freedoms do not apply."). Thus, in deciding whether the government effectuated a "seizure" within the meaning of the Fourth

34

Amendment, it is irrelevant that the material allegedly seized is presumptively protected by the First Amendment. As the district court properly recognized, the protected status of the material is instead relevant only in deciding whether the challenged government acts constituted a prior restraint on speech in violation of the First and Fourteenth Amendments.

The few cases to expressly address this issue support the conclusion that a constructive seizure of expressive material violates only the First and Fourteenth Amendments. In Penthouse International, Ltd. v. McAuliffe, 610 F.2d 1353 (5th Cir. 1980), and ACLU v. City of Pittsburgh, 586 F. Supp. 417 (W.D. Pa. 1984), government officials engaged in patterns of harassment, including warrantless arrests and threats of prosecution, to try to stop local sales of allegedly obscene magazines. Although the government officials did not actually seize the magazines, the courts determined that the harassing conduct in each case resulted in a "constructive seizure" that ran afoul of the Constitution. Penthouse, 610 F.2d at 1361; City of Pittsburgh, 586 F. Supp. at 422. Neither court, however, based its ruling on the Fourth Amendment. Rather, both courts determined that the constructive seizure of the magazines created a prior restraint on speech that violated the First and Fourteenth Amendments. See Penthouse, 610 F.2d at 1362 ("we conclude that . . . McAuliffe's enforcement activities of numerous and harassing arrests prior to a final adjudication upon the issue of obscenity *vel non*

35

subjected the August issues of the magazines in question to an informal system of prior restraint in violation of the First and Fourteenth Amendments"); City of Pittsburgh, 586 F. Supp. at 427 ("The defendant Mayor's threatened 'massive sweep' and 'initiation of criminal proceedings' against vendors of Hustler magazine, prior to a judicial determination that the Easter edition of Hustler magazine was in fact obscene . . . amounts to an unconstitutional abuse of power in violation of the First and Fourteenth Amendments to the United States Constitution."). The district court properly rejected Camfield's Fourth Amendment constructive seizure claim.

### Evidentiary Issues

Camfield contends that the district court erred in excluding evidence involving his First and Fourteenth Amendment claims as irrelevant. He also contends that the court erred in refusing to admit testimony concerning the method that Sgt. High used in other situations to obtain copies of The Tin Drum as evidence of habit. We review the district court's exclusion of evidence for an abuse of discretion. Vining v. Enter. Fin. Group, Inc., 148 F.3d 1206, 1217 (10th Cir. 1998). Under this standard, the district court's decision will be reversed only if it is manifestly erroneous. Moss v. Feldmeyer, 979 F.2d 1454, 1461 (10th Cir. 1992).

36

*Relevancy*

Prior to trial, Camfield informed the district court that he intended to introduce exhibits and testimony relating to his First and Fourteenth Amendment claims, including the artistic merit of The Tin Drum, its protected status under the First Amendment, and the fact that the OCPD unconstitutionally removed the movie from public circulation without a prior adversarial hearing. The district court sustained the defendant's irrelevancy objections to this evidence, stating these issues "have not only been ruled on by the court, but have been decided in plaintiff's favor." App. Vol. 18 at 5810. In an abundance of caution, however, the district court instructed the jury that The Tin Drum "does not contain child pornography in violation of Oklahoma law and is protected by the First Amendment to the Constitution of the United States." App. Vol. 20 at 6516.

Camfield argues that the district court's ruling was improper because it treated First Amendment material as ordinary contraband rather than affording it the special protections enjoyed under the Fourth Amendment. As we explained previously, however, the protected status of First Amendment material is relevant only in determining whether the police initiated a prior restraint on speech, not in deciding whether the police actually "seized" that material. Camfield's evidence relating to his First and Fourteenth Amendment issues was irrelevant and thus inadmissible under Rule 402 of the Federal Rules of Evidence. The district court

did not abuse its discretion in limiting the evidence at trial to Camfield's Fourth Amendment claim.

*Habit evidence*

In an attempt to bolster his claim that he did not voluntarily surrender his copy of The Tin Drum, Camfield made a pretrial proffer that five video store clerks and one customer would testify that Sgt. High told them he was there to seize their copies of The Tin Drum because a judge had ruled that the movie contained either obscenity or child pornography. Camfield argued the testimony was admissible as evidence of Sgt. High's "habit" under Rule 406 of the Federal Rules of Evidence. The district court disagreed and excluded the testimony.

A habit is a regular practice of meeting a particular situation with a specific type of conduct, "'such as the habit of going down a particular stairway two stairs at a time, or of giving a hand-signal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic.'" United States v. Troutman, 814 F.2d 1428, 1455 (10th Cir. 1987) (quoting Fed. R. Evid. 406 advisory committee notes). Announcing the seizure of child pornography upon walking into a video rental store is not a semi-automatic act and could not serve as a basis for habit evidence. Further, while it is not clear from the record whether the six witnesses would each testify to a

38

separate event, we have previously stated that "[f]ive incidents ordinarily would be insufficient to establish the existence of a habit." Perrin v. Anderson, 784 F.2d 1040, 1046 (10th Cir. 1986) (citing Reyes v. Missouri Pac. Rwy. Co., 589 F.2d 791, 794-95 (5th Cir. 1979)). The district court did not abuse its discretion in holding that the testimony was inadmissible as habit evidence under Rule 406.

## Jury Instructions

Camfield contends that the district court improperly instructed the jury on the question of his voluntary consent. He also contends the court erred in refusing to give his proposed instruction on presumed damages. "'We review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law.'" Garcia v. Wal-Mart Stores, Inc., 209 F.3d 1170, 1173 (10th Cir. 2000) (quoting United States v. Cerrato-Reyes, 176 F.3d 1253, 1262 (10th Cir. 1999)).

*Voluntary consent*

At the end of the trial, the district court gave twenty-one instructions to the jury. Instruction No. 14 dealt with the voluntariness of Camfield's consent to surrender his rented copy of The Tin Drum. On appeal, Camfield challenges the following portion of that instruction:

39

You are further instructed that acquiescence to a claim of lawful authority, standing alone, is not enough to show a voluntary consent. Similarly, voluntary consent cannot be based on a misrepresentation of the existence of lawful authority. In this regard, the conduct of the officers in this case must be determined as of the date of its occurrence.

App. Vol. 20 at 6423-24. Camfield's exact disagreement with this portion of Instruction No. 14 is unclear. Our inability to decipher Camfield's argument on appeal is further compounded by his failure to "distinctly state 'the matter objected to and the grounds of the objection'" in the district court. Davoll v. Webb, 194 F.3d 1116, 1141 (10th Cir. 1999) (citing Fed. R. Civ. P. 51 ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.")). Because Camfield did not state the grounds of his objection in "obvious, plain, or unmistakable" terms, Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d 1509, 1514 (10th Cir. 1984), our review is for plain error. "'To constitute plain error, the district court's mistake must have been both obvious and substantial.'" Davoll, 194 F.3d at 1141 (quoting Cartier v. Jackson, 59 F.3d 1046, 1050 (10th Cir. 1995)).

The three sentences in the challenged portion of Instruction No. 14 contain neither obvious nor substantial misstatements of the law. The first sentence accurately states that an individual's mere acquiescence to a claim of lawful

40

authority is not, by itself, enough to show voluntary consent. <u>See</u> <u>United States v. Manuel</u>, 992 F.2d 272, 275 (10th Cir. 1993) ("Mere submission to lawful authority does not equate to consent."). The second sentence correctly states that voluntary consent cannot be based on a misrepresentation of lawful authority. <u>See</u> <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548-50 (1968) (holding consent involuntary because officers obtained it after erroneously representing they had a valid warrant). Finally, as the district court explained during the jury charge conference, the last sentence attempts to set forth an objective reasonableness inquiry for the jury to judge the officers' conduct by the facts available on the day of their encounter with Camfield rather than by the fact that <u>The Tin Drum</u> was later held not to violate Oklahoma's child pornography laws. <u>Cf.</u> <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989) ("As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). Further, to the extent that the law on the last issue "is unsettled, the decision to instruct one way or the other does not constitute plain error." <u>Davoll</u>, 194 F.3d at 1141 (citing <u>Heath v. Suzuki Motor Corp.</u>, 126 F.3d 1391, 1394 (11th Cir. 1997)).

*Presumed damages*

Before this case was submitted to the jury, Camfield proposed a damages instruction which stated that, in addition to actual or nominal damages, the jury could award Camfield presumed damages for the loss of his constitutional right to be free from unreasonable seizures in the event the jury found that the officers violated the Fourth Amendment. The district court rejected that instruction and instead instructed the jury to award only actual or nominal damages if it found a Fourth Amendment violation.

Camfield argues that the district court should have given his presumed damages instruction because such damages are appropriate under Bell v. Little Axe Independent School District No. 70, 766 F.2d 1391, 1409 (10th Cir. 1985) ("presumed damages are available for violations of substantive constitutional rights") (citing Corriz v. Naranjo, 667 F.2d 892, 897 (10th Cir. 1981)). According to Sgts. High, Kim and French, however, the district court's damages instruction was proper because the Supreme Court rejected the concept of presumed damages for section 1983 cases in Memphis Community School District v. Stachura, 477 U.S. 299 (1986).

We need not resolve the effect of Stachura on our holding in Bell because in this case "the jury obviously never considered the question of damages, inasmuch as the initial question of liability [on the Fourth Amendment claim] was

42

decided in favor of the defendant[s]." Taylor v. Nat'l Trailer Convoy, Inc., 433 F.2d 569, 571 (10th Cir. 1970). Therefore, "[e]ven if the trial court erred in instructing the jury on [damages], the error is harmless because 'the erroneous instruction could not have changed the result of the case.'" Richards v. City of Topeka, 173 F.3d 1247, 1253 (10th Cir. 1999) (quoting Lusby v. T.G. & Y. Stores, Inc., 796 F.2d 1307, 1310 (10th Cir. 1986)).

## Expungement

Camfield contends that the district court erred in denying his motion to alter or amend the judgment, which requested injunctive relief directing an accounting and expungement of any "personally identifiable information" in OCPD's records that linked Camfield to a child pornography investigation. We review the denial of a Rule 59(e) motion seeking injunctive relief for an abuse of discretion. See Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1231 (10th Cir. 1997).

It is well settled in this circuit that courts have inherent equitable authority to order the expungement of an arrest record or a conviction in rare or extreme instances. See United States v. Pinto, 1 F.3d 1069, 1070 (10th Cir. 1993); United States v. Linn, 513 F.2d 925, 927 (10th Cir. 1975). Notably, however, this court has never addressed the more specific issue of whether the district courts have the authority to order the expunction of identifying information from a police report.

43

Given the fact that "there is a compelling public need for an effective and workable criminal identification procedure," United States v. Seasholtz, 376 F. Supp. 1288, 1290 (N.D. Okla. 1974), it is possible that "[t]he judicial editing of history" could "produce a greater harm than that sought to be corrected" by the expunction of identifying information from a police report, Rogers v. Slaughter, 469 F.2d 1084, 1085 (5th Cir. 1972). Indeed, we have found only one case where a court has ordered such relief. See Gomez v. Wilson, 323 F. Supp. 87, 93 (D.D.C. 1971) (ordering expungement of all police "forms, indexes, and cross-indexes" that identified plaintiff as a suspected vagrant, based on a finding that police stopped plaintiff without any articulable suspicion of illegal activity, questioned him about his activities, and filled out a "vagrancy observation form").

Camfield implies that the civil action provision of the VPPA, 18 U.S.C. § 2710(c), provides statutory authority for expungement of his name from OCPD's records, but that section does not expressly grant such relief. Moreover, although the VPPA provides that a court may award "such other preliminary and equitable relief as the court determines to be appropriate," 18 U.S.C. § 2710(c)(2)(D), this language has not been construed to provide the relief Camfield seeks.

Ultimately, there is no need in this case to decide whether the district court had the authority to order the expungement of Camfield's name from an official

44

police report because the district court was well within its discretion in denying that request. As the district court explained, Camfield's voluntary publication of his identity and his connection with this case in the local and national news media rendered his new-found desire for anonymity unpersuasive. Specifically, Camfield agreed to be interviewed by a local television station within twenty-four hours after the OCPD obtained his copy of The Tin Drum, he appeared on the nationally-televised program "Good Morning America" a few days later, and his name was mentioned in several ACLU press releases and newsletters chronicling his case. At one point, Camfield sent faxes to several news agencies and provided a corrected spelling of his name for future stories. Based on these repeated instances of Camfield's voluntary self-promotion of his association with a film that had been described as containing child pornography, the district court did not abuse its discretion in denying Camfield's motion for injunctive relief.

### III.

We AFFIRM in part and DISMISS in part. Given the Oklahoma Legislature's recent revision of the State's child pornography and obscenity laws, the issue challenging the constitutionality of Okla. Stat. tit. 21, § 1021.2 is dismissed as moot. The remainder of the issues raised are affirmed.

45