**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 10, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LOUELLA OLDBEAR,

Defendant-Appellant.

No. 08-6095

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 5:07-CR-00077-F-1)**

---

William D. Lunn, Law Office of William D. Lunn, Tulsa, Oklahoma, for Appellant.

Arvo Q. Mikkanen, Assistant United States Attorney (John C. Richter, United States Attorney, with him on the brief), Office of the United States Attorney, Oklahoma City, Oklahoma, for Appellee.

---

Before **MURPHY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Louella Oldbear, a member of the Cheyenne-Arapaho Indian Tribes, used

tribal funds to repair one of her personal vehicles and to purchase another.  A

federal jury convicted her of five counts of embezzling Indian tribal funds in

violation of 18 U.S.C. § 1163 and one count of making a false statement to a government agent in violation of 18 U.S.C. § 1001(a)(2).

On appeal, Oldbear contends (1) the district court violated her constitutional rights when it excluded testimony from three defense witnesses who also received tribal funds for personal purposes; (2) her convictions should be overturned for lack of evidence; and (3) the district court improperly allowed the prosecutor to cross-examine her regarding another instance of embezzlement, thus causing her to prejudicially invoke her Fifth Amendment right against self-incrimination.

We agree with the district court that the witness testimony was not relevant to her defense and that the cross-examination did not unduly prejudice her. We also conclude the evidence was sufficient to prove the charges against her. Exercising jurisdiction under 28 U.S.C. § 1291, we therefore AFFIRM her convictions.

## I. Background

### A. The Emergency Assistance Program

Oldbear was an administrative assistant in an office of the Cheyenne-Arapaho Tribes that disbursed funds to tribal members pursuant to an Emergency Assistance Program. The head of the office was Roy Dean Bullcoming, the business committee member for the C-1 District of the Cheyenne-Arapaho Tribes.

According to official program guidelines, only members of the Cheyenne-Arapaho Tribes could receive emergency assistance funds, and funds could be disbursed only "as a last resort or for emergency services not otherwise available." ROA Vol. 3 at 106. Tribal members could apply for emergency assistance only "once every quarter, every three months," and the maximum they could receive at any one time was $200. *Id.* Furthermore, funds were available only for certain categories of expenses, including groceries, temporary shelter, utilities, and medical needs. With respect to transportation, only "bus fare or other low-cost transportation for emergency situations" qualified. *Id.* Vehicle repairs were ineligible.

Oldbear had significant authority over the Emergency Assistance Program in the C-1 District, and administered it when Bullcoming was unavailable. When disputes arose between C-1 District employees and tribal members regarding eligibility for emergency assistance, Oldbear frequently resolved them. She processed tribal members' emergency assistance applications and printed checks from her office and home computers to fulfill emergency assistance requests. She also had access to a rubber stamp of Bullcoming's signature, allowing her to sign checks for tribal funds.

Unfortunately, the Emergency Assistance Program was rife with abuse. Some tribe employees in charge of administering the program did not follow the official guidelines. For example, in the C-1 District Office, many emergency

3

assistance requests went undocumented, and Bullcoming approved them without following formal procedures. This led to arbitrary disbursement of emergency assistance funds and consequent anger among tribal members.

During this time, Oldbear used emergency assistance funds to pay for repairs to her personal vehicle. First she spent $3,145 to replace an engine in her 1993 GMC Safari van. Then she spent $366 for additional repairs to the van. Because she knew the two expenditures were "quite a bit of an amount approved," she requested the $366 in her son's name rather than her own. ROA Vol. 4 at 371.

Around the same time, Oldbear again used emergency assistance funds to pay for her personal transportation, this time purchasing a 2002 Buick LeSabre. Oldbear planned to pay for the car in two installments of around $6,000, but claimed the LeSabre was expensive and her office "couldn't afford to do that with the allocation [of emergency assistance funds] that we had." *Id*. at 369. For this reason, Oldbear asserted, she paid for the car in four installments of around $3,000. But in structuring her payments this way, Oldbear apparently avoided a provision of the tribal guidelines requiring the Cheyenne-Arapaho business committee to explicitly approve purchases in excess of $5,000.

### B. The Federal Investigation

After receiving numerous complaints about mismanagement of the Emergency Assistance Program, tribal officials referred the matter to federal

4

investigators. As part of the investigation, FBI agents interviewed Oldbear on several occasions. During these interviews, she gave conflicting statements.

In a 2004 interview Oldbear told a federal agent that "[tribal] funds were not to be used to purchase cars," though she "cite[d] situations wherein those funds were used to purchase cars by others, the tribe in particular." ROA Vol. 4 at 275–76. Two years later, on September 6, 2006, Oldbear stated during a second interview that "she was not aware of any vehicles purchased by Mr. Roy Dean Bullcoming or the C-1 district for anyone." *Id*. at 294.

In a third interview, however, federal agents once again questioned Oldbear about automobile expenditures. This time, the agents brought checks from the C-1 District, payable to the car dealership from which Oldbear purchased her LeSabre.

When presented with the checks, Oldbear stated that "she did use some of these checks to purchase a 2002 Buick LeSabre." *Id*. at 297–98. An agent asked why she had not shared that information during her previous interviews, and Oldbear explained that "she was worried about her husband finding out about how the vehicle was purchased." *Id*. at 299. Oldbear then asked the agents, "are you going to take me to jail now"? *Id.*

Oldbear was subsequently indicted for embezzlement and making false statements to federal agents.

5

## C. Oldbear's Proffer at Trial

At trial, Oldbear's defense was based on her state of mind at the time of her charged conduct. She sought to show that because Bullcoming approved her expenditures, she believed she was entitled to the funds and thus did not form the requisite intent for embezzlement. To bolster her theory, she planned to call three witnesses who would have testified that they also received emergency assistance funds for personal vehicle repairs.

The government objected, claiming the witnesses' testimony was not relevant because it would shed no light on what the emergency assistance guidelines allowed or prohibited. The witnesses, according to the government, were not tribal employees or administrators of the program, but were mere recipients of emergency assistance funds; their emergency assistance applications were approved only "because of poor bookkeeping, because of somebody who processed [their applications] for incorrect reasons or deliberately." ROA Vol. 4 at 340. This, the government claimed, meant their testimony "really doesn't have anything to do with the facts of the case and what the law says is permissible." *Id*. Oldbear responded that she believed the testimony was evidence of a habit of the tribe to approve expenditures for personal transportation, and the testimony was therefore admissible under Federal Rule of Evidence 406.

To aid its decision on the government's objection, the court allowed Oldbear to conduct a voir dire examination of one of her witnesses outside the

6

presence of the jury. The witness testified she was a member of the Cheyenne-Arapaho Tribes and lived in the C-1 District. She stated that in 2002, she applied for $604 of emergency assistance funds to pay for car repairs, and Bullcoming approved her application. On cross-examination, the witness admitted she had no knowledge of the official guidelines for the Emergency Assistance Program, having simply "filled out [a] form and presented it." *Id*. at 349.

After this proffer, the court ruled to exclude the evidence on relevance grounds. The court characterized the testimony as attempting to establish an "everybody-is-doing-it defense." *Id*. at 352. The court stated that "evidence of a mere deviation from the emergency assistance program guidelines is not probative of any matter that is put in issue . . . . And that's all we have from [the witness] is evidence of a mere deviation." *Id*.

The court then confirmed with Oldbear's counsel that her other witnesses would testify "to the same effect," *id*. at 353, and extended its ruling to the remaining defense witnesses.

### D. Oldbear's Testimony

As a result of the district court's ruling, the only witness called on behalf of the defense was Oldbear herself. She testified that Bullcoming "was the ultimate decision-maker on whether someone would receive" emergency assistance, and he had approved her expenditures. ROA Vol. 4 at 362. She also stated her job required her to drive frequently and she needed transportation to

7

fulfill her work duties. She claimed there "was a lot of wear and tear on my vehicle and my husband was always upset that . . . the car was always breaking down." *Id*. at 367. This, she claimed, was the reason she needed tribal funds to repair her GMC and purchase the Buick.

Oldbear also claimed the purchase of the Buick was not her idea. She asserted that another tribal employee had originally suggested she needed "reliable transportation," and the employee had talked to Bullcoming about purchasing Oldbear a car. *Id*. at 368. Oldbear stated that "at the time, I did not know that it was wrong" to purchase a personal vehicle using tribal funds. *Id*. at 369.

On cross-examination, however, Oldbear admitted "[t]here was no emergency" justifying her purchase of the Buick and repair of the GMC using tribal funds. *Id*. at 382. She also admitted she could have used tribe-owned vehicles, specifically a tribe van, to fulfill at least some of her work duties. Furthermore, shortly after purchasing the Buick, Oldbear ceased driving it and gave the car to her son. She explained she had done so because she was worried other tribal members would "not like that [I had] a new car." *Id*. at 372. Finally, she conceded she had helped Bullcoming obtain his own car with tribal funds: a 2001 Pontiac Grand Am. Nonetheless, she maintained she had done nothing wrong and claimed the federal investigation leading to her indictment was merely a product of "tribal politics." ROA Vol. 4 at 389.

## II. Discussion

Oldbear makes three claims on appeal: (1) the district court violated her constitutional rights and the Federal Rules of Evidence when it excluded testimony from three witnesses; (2) the evidence was insufficient to prove Oldbear committed embezzlement or made a material misrepresentation to a federal agent; and (3) Oldbear suffered prejudice when the trial court allowed the prosecution to inquire into a prior act of embezzlement, causing her to invoke her Fifth Amendment right against self-incrimination.

We address each claim in turn.

### A. The Excluded Defense Witnesses

Oldbear's first claim centers on the three defense witnesses the district court excluded from trial. She argues the district court "gutted her defense" and thereby denied her due process when it excluded the witnesses' testimony. Aplt. Br. at 23. In addition, she argues the testimony would have established it was the tribe's habit to pay for car repairs, and the testimony was therefore relevant under Federal Rule of Evidence 406 to prove she believed she was entitled to the funds and could not have committed embezzlement. Neither argument has merit.

### *(1) Due Process*

Before discussing the substance of Oldbear's due process argument, we must address the applicable standard of review. At trial, Oldbear did not raise any constitutional objections to the exclusion of her witnesses; she instead relied

9

entirely on the Federal Rules of Evidence. Thus, we may review her due process claim for plain error only. *See United States v. Traxler*, 477 F.3d 1243, 1248 (10th Cir. 2007) (citing *United States v. Battle*, 289 F.3d 661, 664–65 (10th Cir. 2002)). And because Oldbear's briefs on appeal fail to address the plain error standard, she has waived her constitutional argument. *United States v. LaHue*, 261 F.3d 993, 1009 (10th Cir. 2001); *see also United States v. Solomon*, 399 F.3d 1231, 1238 (10th Cir. 2005). Nonetheless, even ignoring her waiver, the claim fails on the merits under plain error review. The court did not commit legal error.

Although "[t]he right to present a defense is a fundamental element of due process of law . . . . the right to present defense witnesses is not absolute. A defendant must abide the rules of evidence and procedure." *United States v. Bautista*, 145 F.3d 1140, 1151–52 (10th Cir. 1998) (internal quotation marks and citations omitted). Thus, an evidentiary ruling infringes a defendant's due process rights only if the district court violates the Federal Rules of Evidence. *Id.* at 1152. And a district court violates the Rules of Evidence only if it abuses its broad discretion—i.e., only if its ruling is based "on a clearly erroneous finding of fact or an erroneous conclusion of law," or the ruling "manifests a clear error in judgment." *United States v. Dowlin*, 408 F.3d 647, 659 (10th Cir. 2005) (quoting *United States v. Jenkins*, 313 F.3d 549, 559 (10th Cir. 2002)). Additionally, to establish a due process violation, Oldbear must show she was denied fundamental fairness, i.e., that the excluded evidence might have affected

10

the outcome of her trial. *See id*. (quoting *Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997)). For several reasons, the district court neither abused its discretion under the Rules of Evidence nor denied Oldbear fundamental fairness when it excluded the testimony of her proffered witnesses.

*First*, the district court properly concluded the testimony was irrelevant. Though the standard for relevance under Federal Rule of Evidence 401 is quite generous, *see United States v. Jordan*, 485 F.3d 1214, 1218 (10th Cir. 2007), proffered evidence must, at minimum, advance the inquiry of some consequential fact to be considered relevant and admissible. *See* 7 Kenneth S. Broun, *McCormick on Evidence* § 185 (6th ed. 2006). The consequential facts at issue during Oldbear's trial were whether the tribe authorized her expenditures and whether she possessed the requisite intent to commit embezzlement. Oldbear has failed to show how her proffered witnesses' testimony affected the degree of probability of these facts, *see* Fed. R. Evid. 401, or advanced the inquiry with respect to them.

The proffered witnesses were not employees of the tribe and were uninformed about the emergency assistance application process. Indeed, during Oldbear's proffer, her witness admitted having no knowledge of whether the tribe had even enacted any guidelines controlling the disbursement of emergency assistance funds. As the district court noted, the witnesses' testimony would merely have established that the Emergency Assistance Program was being

11

managed in a "sloppy" or corrupt manner. ROA Vol. 4 at 312. Such evidence could not prove whether the tribe approved Oldbear's expenditures, nor could it shed any light on her state of mind. *See United States v. Hernandez*, 693 F.2d 996, 1000 (10th Cir. 1982) (concluding the district court did not err in excluding certain testimony on relevance grounds because the witnesses admitted they had "no knowledge of [the defendant's] intent"). The district court therefore acted within its discretion in excluding the testimony on relevance grounds.

*Second*, putting aside questions of relevance, the testimony was properly excluded under Federal Rule of Evidence 403.[1] Rule 403 grants a district court discretion to exclude even relevant evidence if its probative value is outweighed by such considerations as unfair prejudice, confusion of the issues, or misleading the jury. *Macsenti v. Becker*, 237 F.3d 1223, 1240 (10th Cir. 2001).

Here, the district court aptly characterized Oldbear's proffer as an attempt to establish an "everybody-is-doing-it defense." ROA Vol. 4 at 352. Essentially, the witnesses would have testified that they, like Oldbear, were allowed to use tribal funds to pay for personal transportation expenses. But only Oldbear's actions and state of mind were material to her guilt. And the fact that others may have been the beneficiaries of improper conduct does nothing to excuse Oldbear.

---

[1] Though the district court did not rely on Rule 403 to exclude the testimony, we may affirm a district court's evidentiary rulings for any reason supported by the record. *United States v. Ledford*, 443 F.3d 702, 707 (10th Cir. 2005).

12

The witnesses' testimony was a sideshow from which the jury could have gleaned little valuable information other than additional instances of sloppy or corrupt management of the Emergency Assistance Program. *See Jordan*, 485 F.3d at 1219 (noting that a defendant's "speculative blaming" of another alleged perpetrator "intensifies the grave risk of jury confusion" (quoting *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998))).

Such testimony only would have served "to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue." *Id*. at 1221 (quoting *McVeigh*, 153 F.3d at 1191). Moreover, ample evidence in the record showed that tribal officials frequently deviated from the emergency assistance guidelines, making the witnesses' testimony, at best, cumulative. *See* Fed. R. Evid. 403 (relevant evidence may be excluded due to "considerations of . . . needless presentation of cumulative evidence"). The testimony was therefore properly excluded under Rule 403 as well.

*Third and finally*, even if the district court somehow erred in excluding the testimony, any error was not a due process violation because it did not affect the fundamental fairness of Oldbear's trial: the excluded testimony, if admitted, would not have "create[d] reasonable doubt that did not exist without the evidence." *Richmond*, 122 F.3d at 872. As explained below, substantial evidence was presented at trial that Oldbear knew the program guidelines and yet violated them in spending tribal funds on car repairs and a new car. Indeed, she sought to

13

hide her conduct from the tribe by giving the Buick to her son instead of driving it herself. Three additional witnesses testifying to the sloppy administration of the Emergency Assistance Program would not have created a reasonable doubt regarding the outcome of the trial, and the exclusion of the witnesses' testimony did not violate Oldbear's due process rights. *See Dowlin*, 408 F.3d at 661 ("In light of the substantial evidence of guilt in the record, we find the district court's exclusion of [certain evidence] did not violate [the defendant's] right to present a defense.").

In sum, the district court did not violate Oldbear's constitutional rights— or, indeed, the Federal Rules of Evidence—when it excluded the testimony of these witnesses. The district court did not commit plain error and Oldbear's due process argument fails.

### *(2) Habit*

Oldbear's second argument regarding her proffered witnesses—that their testimony would have established it was the habit of the tribe to pay for personal transportation—is equally unavailing.

Under Federal Rule of Evidence 406, "[e]vidence of the habit of a person or of the routine practice of an organization . . . is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." We have previously characterized a habit as a semi-automatic act, *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir.

14

1987), and have held that "the very nature of habit evidence is that it is done reflexively." *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 879, 887 (10th Cir. 2006). Furthermore, to prove an act was habitual, we require the proponent to offer evidence of numerous, consistent occurrences of the act. *See Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1232–33 (10th Cir. 2001) (five acts would not suffice).

Applying these principles, the conduct here cannot properly be viewed as habitual. Oldbear's witnesses had no personal knowledge as to whether it was a routine practice of the tribe—rather than an improper deviation from tribal policy—to approve emergency assistance applications for personal transportation expenses. *See* 7 *McCormick on Evidence* § 195 (a "routine practice" must be "reasonably regular and uniform"). In any event, Oldbear would have offered only three instances of the supposed habit, which is certainly not sufficient to demonstrate a habitual pattern. *See Camfield*, 248 F.3d at 1232–33. And it should go without saying that illegal acts such as embezzlement cannot properly be characterized as semi-automatic or reflexive. *See Troutman*, 814 F.2d at 1455 (holding that serial extortion, or refraining from extortion, does not constitute a habit under Rule 406).

The district court did not abuse its discretion in concluding the witness testimony failed to satisfy the standards of Rule 406.

15

**B.** **Sufficiency of the Evidence**

Oldbear next makes three contentions regarding the sufficiency of the government's evidence: (1) the government failed to prove she had lawful possession of the tribal funds, a necessary element of embezzlement; (2) she did not have the specific intent necessary to commit embezzlement; and (3) the government failed to prove she made any material misstatements to federal investigators.

We review sufficiency of the evidence claims de novo, but examine the evidence in the light most favorable to the government and ask only whether any rational juror could have found Oldbear guilty beyond a reasonable doubt. *See United States v. Parker*, 553 F.3d 1309, 1316 (10th Cir. 2009). In doing so, "we do not weigh conflicting evidence or consider witness credibility." *Id.* (internal quotation marks omitted).

*(1) Embezzlement and Lawful Possession*

Oldbear claims the government should have been required to "call[ someone] . . . to provide . . . business record[s] or testimony to indicate that Roy Dean Bullcoming had *not* signed the . . . checks" for Oldbear. Aplt. Br. at 32 (emphasis added). Because the government failed to do so, Oldbear claims it could not prove she, rather than Bullcoming, had lawful possession of the tribal funds she used to pay for repairs to her GMC and to purchase the Buick.

16

This argument is meritless. The government introduced testimony from numerous witnesses, including Oldbear herself, proving she could issue checks for emergency assistance funds. This evidence leaves no doubt she had lawful possession of tribal funds. *See United States v. Weller*, 238 F.3d 1215, 1219 (10th Cir. 2001) (those in management positions, who have "special access" to funds, have the "lawful possession" necessary for an embezzlement charge (quoting *United States v. Whitlock*, 663 F.2d 1094, 1107 (D.C. Cir. 1980))).

Second, even if Bullcoming had indeed signed Oldbear's checks and thereby approved Oldbear's use of tribal funds, nothing prevented the jury from finding that Oldbear knew she lacked authorization from the *tribes* to use funds for her personal transportation expenses. The evidence also allowed the jury to find that Bullcoming was himself part of the embezzlement scheme. *Cf. United States v. Holmes*, 611 F.2d 329, 331 (10th Cir. 1979) ("Although no conspiracy was charged in the instant case, the evidence showed that defendant and [another perpetrator] conspired to defraud the bank and to use the proceeds so obtained.").

The evidence showed Oldbear knew the guidelines, was familiar with the emergency assistance process, was the only employee who could print checks for emergency assistance funds, and used funds to pay for personal expenses in violation of the guidelines. This was clearly sufficient for a rational juror to find Oldbear had lawful possession of tribal funds for purposes of her embezzlement charge.

17

### (2) Intent to Commit Embezzlement

Oldbear also asserts the evidence was insufficient to prove she had the requisite specific intent to commit embezzlement. She argues that because Cheyenne-Arapaho business committee members such as Bullcoming "held the purse strings," and had discretion to allocate funds, "there was no reason for [Oldbear] to believe she would not be entitled" to funds for car repairs and a new car. Aplt. Br. at 36.

The jury instructions in this case defined embezzlement as follows: "'[e]mbezzlement' means the wrongful, intentional taking of money or funds of another after the money or funds have lawfully come within the possession or control of the person taking it." ROA Vol. 1 at 140. The instructions further stated that good faith was a complete defense, because "good faith on the part of the defendant is simply inconsistent with a finding that defendant acted knowingly and willfully as stated in the elements of the crimes charged. . . . An honest mistake in judgment or an error in management does not rise to the level of knowledge and willfulness required by statute." *Id*. at 144. If the evidence was sufficient to satisfy the various mens rea elements contained in these instructions, it was necessarily sufficient to satisfy the specific intent required for embezzlement under 18 U.S.C. § 1163. *See United States v. Falcon*, 477 F.3d 573, 578 (8th Cir. 2007) (concluding in a case brought under § 1163 that similar instructions required a finding of specific intent).

18

A review of the record demonstrates the evidence presented at trial was sufficient to prove Oldbear's intent to commit embezzlement. Perhaps most damning is Oldbear's admission that she gave the LeSabre to her son to avoid the suspicion of her fellow tribe members. Oldbear testified she knew "[t]he district will not like that [I had] a new car and they are going to [ask] question[s]." ROA Vol. 4 at 372. Oldbear also admitted that because she gave the LeSabre to her son, her earlier statement that she needed the LeSabre for work was false:

> [Prosecutor]. But then your son said you didn't even drive it to work. . . . [Y]ou didn't even use the car. After you justified that you needed it, you didn't even drive it to work, did you?
>
> [Oldbear]. No, I didn't.

*Id*. at 381. Furthermore, Oldbear admitted she used her son's name, rather than her own, to obtain funds to repair her GMC. To say the least, this casts suspicion on Oldbear's claim that she believed she was entitled to tribal money for personal car repairs. And contrary to Oldbear's arguments, we lack authority to review the jury's decision to discredit Oldbear's innocent explanations for her state of mind. *Parker*, 553 F.3d at 1316 (noting that we may not overturn a jury's credibility findings on appeal).

More than enough evidence was submitted for a rational juror to find that Oldbear wrongfully and intentionally took money from the tribe. Her sufficiency of the evidence claim regarding specific intent therefore fails.

19

### (3) Material Misrepresentation to a Federal Agent

Oldbear's final sufficiency of the evidence claim concerns her conviction for making a false material statement to government agents. She makes two arguments in support of this claim: (1) the FBI agents' trial testimony was flawed, and (2) the evidence failed to show any misstatements she made were "material."

Oldbear's first argument essentially asks us to play the role of fact-finder. She asserts the FBI agents' testimony at trial was internally inconsistent and lacked credibility. During the prosecution's case-in-chief, an FBI agent testified Oldbear stated in a 2004 interview that tribal funds "were used to purchase cars by others, the tribe in particular." ROA Vol. 4 at 275–76. Another FBI agent testified that in 2006, Oldbear stated she was unaware of cars being purchased by Bullcoming or the C-1 District (though she changed her story when presented with tribal checks made out to her car dealer). Oldbear asserts that the contradictions in the two agents' testimony "raise[] serious doubts about whether [the second agent] remembered his question properly or whether [Oldbear] had understood it properly." Aplt. Br. at 42. Oldbear also claims the FBI agents' testimony was not credible because the agents did not write or record her responses to their interview questions.

As stated above, we are not in the position to revisit the jurors' credibility assessments, nor are we allowed to re-weigh conflicting evidence. *See Parker*,

20

553 F.3d at 1316. This is exactly what Oldbear would have us do, and her sufficiency of the evidence claim therefore fails.

The record, moreover, contains sufficient evidence for a rational juror to find Oldbear made a false statement to a federal agent. The federal agents provided the jury with a specific sequence of events: Oldbear initially claimed she had no information regarding cars purchased by Bullcoming and the C-1 District, although she might have been aware that tribal officials had purchased cars for the tribe in the past. Later, when presented with irrefutable evidence in the form of checks from the C-1 District to her car dealer, she changed her story entirely and admitted Bullcoming had approved her use of tribal funds to pay for a personal vehicle. Indeed, Oldbear herself admitted during cross-examination that she had failed to tell the whole truth during her first interview with the FBI agent:

> [Prosecutor]. Now, these four checks are the same ones that you admitted to . . . and then you picked those out on your kitchen table as the ones that went to pay for this LeSabre, right?
>
> [Oldbear]. Yes.
>
> Q. And you told him you didn't tell him the truth the first time around on the 6th when you saw him because you were embarrassed because your husband didn't know exactly what happened here, correct?
>
> A. Yes.

21

ROA Vol. 4 at 405. Oldbear's own admissions therefore bolster the FBI agents' testimony and refute her argument that she made no misstatements to federal officials.

Oldbear's second argument is that the evidence was insufficient to prove her misstatement to the FBI agents was "material" under 18 U.S.C. § 1001(a)(2). This argument is belied by the record and therefore fails. An FBI agent testified at trial that the issue of whether emergency assistance funds were used to buy personal vehicles for tribe members "was one of the issues that we were originally briefed on as a concern on how funds were being used in this investigation." ROA Vol. 4 at 275. This testimony alone would allow a rational juror to find that Oldbear's false statement was material.

Because there was ample evidence in the record for a rational juror to find Oldbear made a material misstatement to the FBI, Oldbear's sufficiency of the evidence claim regarding her conviction for making a material misstatement fails.

## C. Cumulative Error and Oldbear's Invocation of the Fifth Amendment

Finally, Oldbear asserts the district judge improperly allowed the prosecution to ask her about a prior instance of embezzlement for which she had not been criminally charged. This line of questioning forced her to invoke her Fifth Amendment right against self-incrimination, and she argues her invocation of constitutional rights prejudiced the jury against her. She claims this

22

constitutional violation, in addition to the court's exclusion of her defense witnesses, amounted to cumulative error warranting reversal.

As an initial matter, we have already concluded the district court committed no error in excluding Oldbear's defense witnesses. Cumulative error cannot be predicated on non-errors. *See Smith v. United States*, 555 F.3d 1158, 1171 (10th Cir. 2009) (quoting *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1125 (10th Cir. 1995)). We therefore proceed to analyze whether the district court committed reversible error in allowing the prosecution to inquire into Oldbear's prior act of embezzlement. We review this issue de novo. *United States v. Rivas-Macias*, 537 F.3d 1271, 1278 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 1371 (2009).

Before trial, in a Federal Rule of Evidence 404(b) notice, the government informed Oldbear's counsel and the court that it intended to question Oldbear regarding a prior act of embezzlement she committed while working at a local Indian social group. In response to this notice, Oldbear's counsel argued the evidence lacked foundation and failed to satisfy Rule 404(b), but never suggested Oldbear intended to invoke her Fifth Amendment rights.

At trial, the government attempted to question Oldbear regarding the prior embezzlement. Defense counsel immediately objected, and the court held a sidebar conference outside the hearing of the jury. At the bench conference, defense counsel again failed to raise any Fifth Amendment objections. The

23

parties argued the admissibility of the evidence under the Federal Rules, and the court decided to admit it with a limiting instruction.

After the bench conference, the government resumed its questioning. Immediately, however, Oldbear interjected and asked, "Judge, do I have the right to the Fifth to not answer anything . . . since [the embezzlement] does not involve the Cheyenne-Arapaho tribe?" ROA Vol. 4 at 396. The court then took a recess to determine whether Oldbear's invocation of the Fifth Amendment was proper.

During the recess, the court held a brief hearing, and ruled to exclude the questions on Fifth Amendment grounds. The court then recalled the jury and gave a lengthy curative instruction, ordering the jury to "dismiss from your minds any consideration or consideration in any way of the last two questions." *Id.* at 399–400. Counsel neither moved for a mistrial nor objected to the contents of the curative instruction.

Oldbear now contends this sequence of events caused her prejudice. She asserts that the court "essentially emasculated [her] efforts to defend herself" and that the curative instruction was ineffective. Aplt. Br. at 46. We disagree.

Any constitutional violation, and we doubt one occurred, was invited by Oldbear. The district court handled the proffered evidence with care, properly limiting its scope and use. It was Oldbear herself who raised the constitutional argument. Our invited error doctrine prevents a defendant or counsel from lying in wait for potential mistakes, and then seeking to reverse the outcome of trial.

24

*See United States v. Deberry*, 430 F.3d 1294, 1301–02 (10th Cir. 2005) ("The invited-error doctrine 'prevents a party who induces an erroneous ruling from being able to have it set aside on appeal.'" (quoting *United States v. Burson*, 952 F.2d 1196, 1203 (10th Cir. 1991))).

Even on the merits, the question and answer produced at worst negligible prejudice. Oldbear was not forced to answer any questions after she invoked her Fifth Amendment rights, and the prosecution never commented on her decision to invoke those rights. While "curative instructions do not always cure," this was an isolated incident and the district court's instruction was adequate to prevent, or at least greatly mitigate, any prejudice. *See United States v. Harrold*, 796 F.2d 1275, 1281 (10th Cir. 1986). Given the circumstances—particularly defense counsel's failure to give prior notice of the Fifth Amendment issue—the court acted reasonably in treating Oldbear's objection with the seriousness it deserved and taking prompt measures to mitigate any potential jury prejudice.

### III.  Conclusion

For the foregoing reasons, we AFFIRM Oldbear's conviction.