**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 13, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

EMILY ANNE SAUPITTY,

Defendant-Appellant.

No. 09-6186
(D.C. No. 5:08-CR-00114-D-1)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TYMKOVICH**, **BALDOCK**, and **HOLMES**, Circuit Judges.

---

Defendant Emily Anne Saupitty was convicted of thirty-three counts of embezzlement from an Indian tribal organization in violation of 18 U.S.C. § 1163. She challenges the sufficiency of the evidence supporting her conviction. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

While serving as the Tax Commissioner of the Apache Tribe of Oklahoma (the "Tribe"), Ms. Saupitty diverted tribal tax revenues to a bank account she established without the Tribe's knowledge and that she solely controlled. Over a two-year period, she withdrew all of the Tribe's funds from that account–more than $100,000–which she used to pay for her personal expenses, among other things. She was sentenced to twenty-seven months' imprisonment, followed by two years of supervised release, restitution of $107,627.65, and 104 hours of community service.

On appeal, Ms. Saupitty contends that there is insufficient evidence that she possessed the requisite intent to commit the charged embezzlement. Her counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 744 (1967), stating that this appeal is frivolous, and a related motion to withdraw. Ms. Saupitty was given an opportunity to file a response to her counsel's *Anders* brief, but did not do so. Based on our thorough, independent review of the record, *see id.*, we affirm, and we grant counsel's motion to withdraw.

Background

Ms. Saupitty is an enrolled member of the Tribe. She previously served on its five-member Business Committee, which manages the Tribe's day-to-day affairs in accordance with the Tribe's constitution, and as the Tribe's appointed Tax Commissioner. Under the Tribe's General Revenue and Taxation Act of 1992 (the Tax Act), all tax money is to be deposited in the Tribe's treasury

account. Under the Tax Act, the Tax Commissioner is authorized to receive taxes, but not to spend these funds on her own authority.

In 2001, the Tribe entered into a contract with a California attorney, Dennis Chappabitty, to assist the Tribe in collecting tax revenues from oil and gas companies that drilled on tribal land. In November 2002, Mr. Chappabitty received a revenue check from an oil company made out to the Apache Tax Commission for $9,481.23, which he forwarded to Ms. Saupitty. In January 2003, Ms. Saupitty opened a bank account with that revenue check, without the Tribe's knowledge or authorization, at the Arvest Bank in Lawton, Oklahoma. Ms. Saupitty was the account's only signatory, thus, only she could withdraw funds from it. She listed the name on the account as the Apache Tax Commission, but gave Mr. Chappabitty's address and her home address as the mailing address, not the Tribe's address in Anadarko, Oklahoma. From 2003 to 2004, she deposited $107,627.65 in Tribe oil and gas tax revenues into the Lawton account.

Ms. Saupitty repeatedly wrote checks to herself and made cash withdrawals for "consultant fees." She used this cash to pay for, among other things, computers and office supplies and equipment found in her home; cabinets for her home; travel expenses for herself and other tribal members to attend numerous conferences throughout the country; repairs for her car; clothing, including underwear from Victoria's Secret; her son's rent and back taxes; her brother's

bail bond; food and groceries; craft and fabric supplies; the electric bill for her family's church; donations to television evangelists; banquet and party supplies and prizes; and miscellaneous personal items such as curtain rods, candy, soda, herbs and vitamins, and horse shampoo. She eventually withdrew all of the Tribal funds in the Arvest account.

The Tribe discovered that Ms. Saupitty had been diverting its oil and gas tax revenues in early 2004, when the oil company brought suit in federal court, challenging the Tribe's tax assessment against it. Because the Tribe had no record of the oil company's tax checks, it conducted an audit. In April 2004, the Tribe held a meeting to discuss the missing oil and gas tax revenues. Ms. Saupitty was repeatedly asked if she had received the oil company's tax checks or money. She denied receiving these tax revenues and accused others of having the tax money. When the Tribe discovered that Ms. Saupitty had been endorsing and depositing its tax checks into a bank account in Lawton, it initiated an investigation by the FBI. The FBI was able to recover records relating to some, but not all of the funds withdrawn by Ms. Saupitty.

## Sufficiency of the Evidence

On appeal, Ms. Saupitty contends the evidence at trial was insufficient to prove that she had the requisite intent to commit embezzlement. She testified at trial that there were tribal resolutions authorizing her to open a bank account for tax revenues and to withdraw funds from that account to pay any Tax Commission

-4-

expenses. She testified that two members of the Tribe's Business Committee were aware that she had opened the Lawton bank account. She testified that the computer and office equipment and supplies at her home were Tax Commission expenses, as were her consulting fees, travel expenses, car repair expenses, and party expenses. She had no explanation for many of her withdrawals, but testified that she used many of the cash withdrawals to give gifts to needy tribal members. Based on her testimony, she argues that all of her actions and use of tribal tax revenues were authorized and made in good faith, and not for personal gain.

In assessing such sufficiency challenges, we review the evidence presented *de novo*, viewing it in the light most favorable to the government, as the prevailing party, asking only if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Oldbear*, 568 F.3d 814, 822-23 (10th Cir.) (reviewing sufficiency of evidence for an 18 U.S.C. § 1163 tribal embezzlement conviction), *cert. denied*, 130 S. Ct. 263 (2009). "In so doing, we do not weigh conflicting evidence or credibility, but ask only whether the government's evidence, credited as true, would establish the elements of the crime." *United States v. Rakes*, 510 F.3d 1280, 1284 (10th Cir. 2007).

Section 1163 provides that, "[w]hoever embezzles, steals, knowingly converts to his use or the use of another, willfully misapplies, or willfully permits to be misapplied, any of the moneys, funds, credits, goods, assets or other

property belonging to any Indian tribal organization or intrusted to the custody or care of any officer, employee or agent of an Indian tribal organization" shall be fined and/or imprisoned. The jury instructions in this case stated that the government was required to prove that Ms. Saupitty 'knowingly' converted funds or property, and that an "act is done 'knowingly' if it is done voluntarily and intentionally, and not because of ignorance, mistake, or accident." R. Vol. I, at 120. The jury was instructed that "when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose'" and "may be proved where the defendant knowingly performed an act, deliberately and intentionally 'on purpose' as contrasted with accidently, careless or unintentionally." *Id*. at 121-22. The jury was further instructed that "because there is no way of fathoming or scrutinizing the operations of the human mind[, it] may infer the defendant's intent from the surrounding circumstances" and "may consider any statements made and any acts done or omitted by the defendant, and all other facts and circumstances in evidence that indicate her state of mind." *Id*. at 123. The jury was also instructed that a defendant "does not act 'willfully' if she believes in good faith that she is acting within the law or that her actions comply with the law, even though the belief turns out to be incorrect or wrong." *Id*. at 124.

We have carefully reviewed the record and conclude that the evidence was sufficient to prove Ms. Saupitty's intent to embezzle tribal funds under § 1163.

There was ample evidence that Ms. Saupitty knew her actions did not comply with the law and were not authorized by the Tribe. As noted, under the Tax Act, all tax money must be deposited in the Tribe's treasury account, and the Tax Commissioner is not authorized to spend these funds on her own authority. Tribal officials testified Ms. Saupitty was aware of these Tax Act provisions. She did not deposit the oil and gas tax revenues in the Tribe's treasury account, and admitted to the FBI that her intent in setting up the Lawton account was to prevent the Tribe's Business Committee from being able to remove these funds. She also admitted at trial that she set the account up in Lawton because she did not want an Anadarko bank to ask the Tribe if such an account was authorized. All of the Tribal officials who testified at trial stated that they were completely unaware of the Lawton account or Ms. Saupitty's use of its funds. The two members of the Tribe's Business Committee who Ms. Saupitty claimed were aware of her actions both denied any such knowledge at trial. A rational juror could conclude from this evidence that Ms. Saupitty knew that diverting the Tribe's tax revenues to the Lawton bank account was not authorized by the Tribe and that she intended to misapply the Tribe's tax revenues.

Tribal officials testified that to obtain authorization to pay any Tax Commission expenses, the Tax Commissioner must submit a written budget to the Business Committee and submit all expense and reimbursement requests to the Tribe's Finance Office. The Finance Office pays out any such expenses by

issuing a check on the Tribe's account with two approving signatures. The Tribe does not allow checks from its account to be written to cash, nor does it allow its Tax Commissioners to write their own checks. Tribal officials testified that Ms. Saupitty was aware of these procedures because she had served on the Business Committee and historically had filled out and submitted the proper paperwork for expense and reimbursement requests. Ms. Saupitty did not submit a written budget to the Business Committee or submit any payment requests to the Finance Office for any of her withdrawals from the Lawton bank account. More specifically, tribal officials testified that Ms. Saupitty did not have any authorization to purchase computers and office supplies for the Tax Commission, to pay herself a consultant's fee, to reimburse herself or others for travel and car repairs, or to make any other of the payments she made with the funds in the Lawton account. A rational juror could conclude from this evidence that Ms. Saupitty did not have a good faith belief that her use of the tribal tax revenues in the Lawton account were authorized, but instead intended to embezzle the Tribe's funds.

Ms. Saupitty did not present any evidence in support of her testimony that the Tribe authorized her to open the Lawton bank account, deposit tax revenues in that account, or make any expenditures of any tribal tax revenues. In particular, she did not produce any evidence of the resolutions she claimed existed that authorized her actions. Her explanation was that the FBI had seized all her copies

of the alleged authorizing resolutions when it searched her home and never returned them to her. An FBI agent rebutted this claim, testifying that the FBI provided a complete copy of all the documents it seized from Ms. Saupitty's home to her defense counsel. The government also brought a complete copy of the seized records to the trial. Tribal officials testified there were no tribal resolutions authorizing Ms. Saupitty to open a bank account for its tax revenues. The FBI agent testified that he reviewed all of the Tribe's resolutions at its headquarters and could find no tribal resolutions authorizing Ms. Saupitty's actions. A rational juror could conclude from this evidence that the Tribe did not authorize Ms. Saupitty's actions, that her explanation of why there were no tribal resolutions authorizing her actions is not worthy of belief, and that she intended to misapply and embezzle the Tribe's funds.

Ms. Saupitty's only evidence of purported authorization was a retroactive resolution adopted at a meeting of some tribal oil and gas royalty owners that she called shortly after the oil company filed suit. She declared that the royalty owners' meeting was actually a Special General Council tribal meeting, and presented resolutions electing herself "chairman pro tempore" of the Tribe, affirming herself as the Tribe's Tax Commissioner, and retroactively authorizing her actions in opening a bank account for tax revenues and paying the Tax Commission's expenses. Her meeting notice stated the purpose of the meeting was the enforcement of the Tax Act, and did not state that it was a tribal council

meeting.  Officials of the Tribe and the Bureau of Indian Affairs testified that they did not recognize her meeting as a valid or official tribal council meeting. Even her purported retroactive resolution authorized Ms. Saupitty to pay only Tax Commission expenses; it did not authorize her to pay her son's rent or back taxes, her brother's bail bond; to give money to her church or a television evangelist, or to give gifts to tribal members.  A rational jury could conclude from this evidence that Ms. Saupitty knew that she was not legitimately entitled to use the Tribe's tax revenues, she did not have a good faith belief that the Tribe had authorized her diversion of its funds, and that she intended to embezzle these funds.

Finally, a videotape was introduced at trial of the 2004 tribal meeting at which Ms. Saupitty was asked if she had received the oil company's tax checks. She falsely denied receiving the tax checks, and told the Tribe members they should ask the Tribe's Finance Office, Secretary-Treasurer and Chairmen what had happened to the tax checks, falsely suggesting that they were at fault. A rational juror could conclude from this evidence alone that Ms. Saupitty did not have a good faith belief that her actions were authorized or lawful and that she intended to embezzle the Tribe's funds.  *See Oldbear*, 568 F.3d at 824 (finding sufficient evidence of intent where defendant purchased a new car and repaired another car with tribal funds but gave the new car to her son and used her son's name to have the repairs made in order to avoid the suspicion of the tribal members).

-10-

In conclusion, more than sufficient evidence was presented for a rational juror to find that Ms. Saupitty knowingly, willfully and intentionally embezzled the Tribe's tax revenues in violation of 18 U.S.C. § 1163. Accordingly, defense counsel's motion to withdraw is GRANTED, the judgment of the district court is AFFIRMED.

Entered for the Court

Bobby R. Baldock
Circuit Judge