FILED
United States Court of Appeals
Tenth Circuit

May 13, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DESMOND YANKEY,

      Defendant - Appellant.

No. 13-3169
(D.C. No. 6:12-CR-10085-MLB-10)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **BALDOCK**, and **HARTZ**, Circuit Judges.

---

Defendant Desmond Yankey was convicted by a jury in the United States District

Court for the District of Kansas on one count of distribution of cocaine. *See* 21 U.S.C.

§§ 841(a)(1) and 841(b)(1)(C). He filed a motion for new trial and a motion for

judgment of acquittal on the ground that there was insufficient evidence to support the

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

verdict. The district court denied the motions. Defendant now appeals, arguing that the evidence at trial was insufficient to support his conviction because (1) witnesses who identified him as the culprit could not distinguish him from his brother and (2) the white powder introduced at trial was not scientifically tested or otherwise adequately identified as cocaine. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

Defendant was indicted on charges of distributing cocaine on November 19, 2010, and December 9, 2010. He was acquitted on the November charge but convicted on the December charge. We summarize the evidence on both counts.

On November 19 Wichita Police Department Detective Gary Knowles, acting undercover, made a purchase through Greg Schmidt, a suspect. Knowles drove Schmidt to the parking lot at Logan's Steakhouse. When a gray Mazda registered to Defendant arrived, Knowles gave Schmidt $800 and Schmidt walked over to the Mazda and then returned to Knowles's vehicle. The Mazda departed but soon returned, at which time Schmidt went to the Mazda again, and returned to Knowles's vehicle with a plastic baggy containing "a compressed white powder." R., Vol. 3 at 33. Knowles recognized the substance as cocaine. He had been in the drug-trafficking unit for over six years, had seen cocaine a hundred times before, and had received specialized training in narcotics investigations. Although Knowles had seen a driver's license photograph of Defendant, he was not able to see who was in the Mazda.

2

During these events Wichita Police Department Lieutenant Chris Bannister was conducting surveillance. Bannister had seen Defendant's driver's license photo and obtained his address. He went to that address and saw Defendant get into the Mazda, drive to an apartment complex, go to and depart from Logan's Steakhouse, and then drive to the Old Chicago restaurant, where Bannister saw a dark-colored BMW and a gold BMW in the parking lot. Defendant entered the dark BMW and then returned to his car and drove back to Logan's, where Knowles was waiting. While observing the parking area at Old Chicago, Bannister had recognized other vehicles that belonged to the federal Drug Enforcement Administration (DEA). He later learned that they were also investigating some of the involved parties.

On December 9, 2010, Knowles set up a buy of four ounces of cocaine, this time working with the DEA. He drove to the Old Chicago parking lot. Schmidt drove Defendant there. Knowles first got into the back seat of Schmidt's vehicle, then Defendant and Knowles went to Knowles's vehicle and sat next to each other in the front seat. Knowles was secretly wearing a recording device that captured their conversation. Knowles and Defendant drove to a gold-colored BMW parked in the lot. DEA agent Karrina Brasser, who was conducting surveillance, saw Knowles drive by and identified the man with him as Defendant from his driver's license photograph. Defendant then left in the gold BMW with half of the $2900 that Knowles agreed to pay for the four ounces of cocaine. Knowles testified that this amount was consistent with the market price of four ounces of cocaine at the time. When Defendant returned, he and a third man got into

3

Knowles's car. Knowles gave the other half of the money to the third man, who gave Knowles what appeared to be "powder cocaine" and had the "[s]ame consistency" and "same color" as cocaine. *Id.* at 50, 52. Knowles noticed that Defendant put several hundred dollars in his pocket. After obtaining the powder, Knowles used his scales to confirm that it weighed four ounces. Defendant was arrested about a year and a half later, on April 5, 2012.

At Defendant's trial his attorney showed Bannister a photograph of Defendant's brother, which Bannister incorrectly identified as Defendant. Knowles, however, had earlier testified that he did not recognize the person in that photograph, and both Knowles and Brasser identified Defendant in court as the person they saw on December 9. Brasser testified that she was aware that Defendant had a brother, that she had studied photographs of the two to be able to tell them apart, that she had found them to have different facial structures and to differ in weight by 30 to 40 pounds, and that the person she saw on December 9 was Defendant, not his brother.

The government offered into evidence part of the recorded conversation between Defendant and Knowles on December 9. Early in the discussion Knowles said he had brought scales and wanted to be sure about the weight:

> [Knowles]: Well, I want to . . . it was two grams light last time. I just want to weigh it before I give my money up.
> [Defendant]: What was?
> [Knowles]: *The coke last time*.
> [Defendant]: Oh, yeah . . .

4

Suppl. R., Vol. 1 (Tr. of Gov't Ex. 4) at 1 (emphasis added). Later Defendant said that he would bring "the YAO, the shit" to Knowles and that "when you buy drugs that's the way it is." *Id.* at 3–4. The government did not offer any chemical test, not even a field test, to show that the substances purchased on November 19 and December 9 were cocaine.

## II.     DISCUSSION

"We review sufficiency of the evidence claims de novo, but examine the evidence in the light most favorable to the government and ask only whether any rational juror could have found [the defendant] guilty beyond a reasonable doubt." *United States v. Oldbear*, 568 F.3d 814, 822–23 (10th Cir. 2009). "[W]e do not weigh evidence or credibility; we ask instead only whether the government's evidence, credited as true, suffices to establish the elements of the crime." *United States v. Hutchinson*, 573 F.3d 1011, 1033 (10th Cir. 2009). "We will only disregard testimony as incredible if it gives facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001) (brackets and internal quotation marks omitted).

### A.     Identification of Defendant

Defendant argues that the evidence was not sufficient to show that he was the person involved in the December 9 transaction. He argues that "Knowles' identification of [Defendant] as the participant is derivative of Lt. Bannister's identification and rests on only one alleged face to face contact of relative short duration with [Defendant]."

5

Aplt. Br. at 11. He also argues that Brasser's identification was based only on a brief view of the suspect "from the shoulder up." *Id.*

These arguments ask us to do what we cannot—reweigh the evidence and determine the credibility and reliability of the witnesses. And even if we were to completely disregard Bannister's testimony in light of his difficulty differentiating between pictures of Defendant and his brother, Knowles identified Defendant after they sat "shoulder-to-shoulder" with each other in his car at least twice on December 9, R., Vol. 3 at 43, 46, and Brasser corroborated the identification with her own observations. We cannot overturn the verdict for lack of sufficient identification evidence.

### B.      Identification of Cocaine

Defendant also argues that there was insufficient evidence that the substance exchanged in the December transaction was cocaine. He acknowledges that our precedent does not require a chemical test of the substance, but he argues that the "anecdotal" evidence that was presented by the government is not sufficient. Aplt. Br. at 12.

When a chemical substance is not identified by a scientific test, the government "must [present] enough circumstantial evidence to support an inference that the defendant actually did possess the drugs in question." *United States v. Hall*, 473 F.3d 1295, 1307 (10th Cir. 2007) (internal quotation marks omitted). We have said that such evidence "may include":

[1] Evidence of the physical appearance of the substance involved in the transaction,
[2] evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug,
[3] evidence that the substance was used in the same manner as the illicit drug,
[4] testimony that a high price was paid in cash for the substance,
[5] evidence that transactions involving the substance were carried on with secrecy or deviousness, and
[6] evidence that the substance was called by the name of the illegal narcotic by the defendant or others in her presence.

*Id.* at 1307–08 (internal quotation marks omitted).  Defendant treats this list as if it were a six-factor test.  He argues that evidence of type 2 or 3 was not present and that evidence of types 1, 4, and 6 was not firmly established.  But we have not stated that the evidence must include all these items, or even any of the specific types listed.  *See id.*

In any event, there was sufficient evidence of the listed types to support a reasonable juror in finding that the substance involved in the transaction was cocaine. Knowles, who had special training in narcotics, had been working in narcotics for six years, and had seen cocaine at least a hundred times before, testified that the substance looked like cocaine and had the "[s]ame consistency" and "same color" as cocaine.  R., Vol. 3 at 50.  There was also evidence that the price of the substance matched the high price of cocaine and "that transactions involving the substance were carried on with secrecy or deviousness."  *Hall*, 473 F.3d at 1307 (internal quotation marks omitted). Moreover, in the conversation between Defendant and Knowles, Knowles referred to the substance they had been dealing with as coke; and when there was a disagreement about

how the transaction would be executed, Defendant said, "[W]hen you buy drugs that's the way it is." Suppl. R., Vol. 1 (Tr. of Gov't Ex. 4) at 4.

This evidence is sufficient to sustain the verdict. *See United States v. Castaneda*, 368 F. App'x 859, 861, 863 (10th Cir. 2010) (defendant discussed cocaine transaction in intercepted telephone call, and an officer believed the substance was cocaine); *United States v. Sanchez,* 722 F.2d 1501, 1506 (11th Cir. 1984) (DEA agent testified that he believed substance was cocaine and participants in transaction called the substance cocaine); *cf. United States v. Sanchez DeFundora*, 893 F.2d 1173, 1175–76 (10th Cir. 1990) (evidence was sufficient to show substances were cocaine even though no cocaine was actually introduced into evidence; witnesses testified that they ingested substances that affected them like cocaine and that they were able to resell some substances as cocaine).

## III.  CONCLUSION

We AFFIRM the district court.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge

8